868 F.2d 524
 27 Fed. R. Evid. Serv. 868
 UNITED STATES of America, Appellee,
v.
Anthony SALERNO, Carmine Persico, Gennaro Langella, Anthony
Corallo, Salvatore Santoro, Ralph Scopo,
Christopher Furnari and Anthony
Indelicato, Defendants-Appellants.
 Nos. 91-106, Dockets 87-1075 to 87-1078, 87-1082 to 87-1085
and 87-1208 to 87-1215.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 9, 1987.
Decided Jan. 31, 1989.
 
 Anthony Cardinale, Boston, Mass. (Walter P. Loughlin, Newark, N.J. and Judd Burstein, New York City, of counsel), for defendant-appellant Anthony Salerno.
 Carmine Persico, New York City, pro se.
 Frank Lopez, Brooklyn (Sercarz, Schechter & Lopez, Brooklyn, N.Y., of counsel), for defendant-appellant Gennaro Langella.
 Albert Gaudelli, Flushing, N.Y. (Walter P. Loughlin, Newark, N.J. and Judd Burstein, New York City, of counsel), for defendant-appellant Anthony Corallo.
 Samuel H. Dawson, New York City (Walter P. Loughlin, Newark, N.J. and Judd Burstein, New York City, of counsel), for defendant-appellant Salvatore Santoro.
 John Jacobs, New York City (Walter P. Loughlin, Newark, N.J. and Judd Burstein, New York City, of counsel), for defendant-appellant Ralph Scopo.
 Barry Fallick, New York City (Rochman, Platzer & Fallick, New York City, of counsel), for defendant-appellant Christopher Furnari.
 Robert Blossner, New York City (Mark F. Pomerantz, Warren L. Feldman, David T. Gradberg, Fischetti & Pomerantz, New York City, of counsel), for defendant-appellant Anthony Indelicato.
 John F. Savarese, Asst. U.S. Atty., S.D.N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Aaron R. Marcu, Asst. U.S. Atty., Michael Chertoff and John Gilmore Childers, Sp. Asst. U.S. Attys., New York City, of counsel), for appellee.
 Before PRATT and MAHONEY, Circuit Judges, and BRIGHT, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.
 MAHONEY, Circuit Judge:
 
 
 1
 Anthony Salerno, Carmine Persico, Gennaro Langella, Anthony Corallo, Salvatore Santoro, Ralph Scopo, Christopher Furnari and Anthony Indelicato appeal from judgments of conviction entered in the United States District Court for the Southern District of New York, Richard Owen, Judge, after an eleven week jury trial. All appellants were convicted of RICO conspiracy, 18 U.S.C. Sec. 1962(d) (1982), and substantive RICO, 18 U.S.C. Sec. 1962(c) (1982), violations. All appellants except Indelicato were convicted of conspiracy to commit extortion and twelve counts of extortion or attempted extortion, in violation of 18 U.S.C. Sec. 1951(a) (1982). Scopo was convicted as a principal, and all other appellants except Indelicato were convicted as aiders and abettors, 18 U.S.C. Sec. 2 (1982), of six labor bribery violations, 29 U.S.C. Sec. 186(b)(1) (Supp. IV 1986). Corallo and Santoro were convicted of conspiracy to make extortionate extensions of credit in violation of 18 U.S.C. Sec. 892 (1982). The non-RICO convictions correspond to the predicate acts of the two RICO counts. In addition, Indelicato was charged with three RICO predicate acts of murder, which the jury found he committed, for which there were no corresponding non-RICO counts in the indictment.
 
 
 2
 Each defendant except Indelicato was sentenced to a total of one-hundred years imprisonment. Indelicato was sentenced to forty years imprisonment for his two RICO violations. Corallo and Santoro were each sentenced to total fines of $250,000 and assessed costs of prosecution. All other appellants except Indelicato were each sentenced to total fines of $240,000 and assessed costs of prosecution. Indelicato was fined $50,000. In addition to challenging their convictions on numerous grounds, appellants also challenge the severity of these sentences.
 
 
 3
 By order entered April 1, 1988, this court determined to hear the appeal of defendant Indelicato in banc, limited to the issue addressed in Point II of his brief and Point VI of the government's brief filed with this panel (i.e., whether the simultaneous murders of Carmine Galante, Leonard Coppola and Giuseppe Turano constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. Sec. 1962(c) (1982)). The in banc court thereafter decided that issue adversely to Indelicato and remanded the case to this panel for further proceedings consistent with the in banc ruling. See United States v. Indelicato, 865 F.2d 1370 (2d Cir.1989).
 
 
 4
 We affirm the judgment of the district court, except that we reverse the conviction of Indelicato on the substantive RICO count.
 
 Background
 
 5
 The RICO enterprise alleged in the indictment is an organization known as the "Commission" of La Cosa Nostra, a nationwide criminal society which operates through local organizations known as "families." The indictment alleged, and substantial evidence at trial established, that the Commission has for some time acted as the ultimate ruling body over the five La Cosa Nostra families in New York City and affiliated families in other cities. The general purpose of the Commission is to regulate and facilitate the relationships between and among the several La Cosa Nostra families, and more specifically to promote and coordinate joint ventures of a criminal nature involving the families, to resolve disputes among the families, to extend formal recognition to "bosses" of the families and on occasion resolve leadership disputes within a family, to approve the initiation or "making" of new members of the families, and to establish rules governing the families, officers and members of La Cosa Nostra. There are five New York City families (i.e., the Genovese, Gambino, Colombo, Lucchese and Bonanno families). Since the late 1970s, the Commission was controlled by the bosses of four of those families, often acting through their deputies. Due to internal instability, the Bonanno family was denied a seat on the Commission during this period.
 
 
 6
 The government established that from the late 1970s until 1985, Salerno was first acting boss and subsequently boss of the Genovese family; Corallo was boss of the Lucchese family, which Santoro served as "underboss" and Furnari as "consigliere" (the positions ranking immediately below the family boss); Persico was boss of the Colombo family, Langella its underboss, and Scopo a member of that family and the president and business manager of the District Council of Cement and Concrete Workers, Laborers International Union of North America (the "District Council"); and Indelicato was a member of the Bonanno family, who was approved by the Commission for promotion to the rank of "capo" (i.e., leader of a subordinate group within the family) some time after his participation in the murder of Carmine Galante and two associates, at the direction of the Commission. Philip Rastelli, a rival to Galante for Bonanno family leadership, was originally named a defendant, but was severed from the trial of this case because he was on trial in the Eastern District of New York in another criminal case. Paul Castellano, boss of the Gambino family, was also named a defendant, but was murdered prior to trial.
 
 
 7
 The indictment alleged racketeering acts related to three general Commission schemes.
 
 
 8
 The first scheme, an extortion and labor bribery operation known as the "Club," involved all appellants except Indelicato. The Club was an arrangement between the Commission, several concrete construction companies working in New York City, and the District Council, a union headed by Scopo. The Club was a cooperative venture among the Families, and the Commission set rules and settled major disputes arising out of the scheme. The rules of the Club were: only such construction companies as the Commission approved would be permitted to take concrete construction jobs worth more than two million dollars in New York City; any contractor taking a concrete job worth more than two million dollars would be required to pay the Commission two percent of the construction contract price; the Commission would approve which construction companies in the Club would get which jobs and would rig the bids so that the designated company submitted the lowest bid; the Commission would guarantee "labor peace" to the construction companies in exchange for compliance with the rules of the Club; and the Commission would enforce compliance by threatened or actual labor unrest or physical harm, even to the point of driving a company out of the concrete business. According to the government, seven concrete construction companies were participants in this extortionate scheme.
 
 
 9
 The second scheme, a loansharking conspiracy, involved appellants Corallo and Santoro. Corallo's nephew, John DiLeo, had been running a loansharking operation on Staten Island, in Gambino family "territory," without the permission of the Gambino family. DiLeo's son-in-law, who was the son of a Gambino family member and was engaged in criminal activities with DiLeo, was then ordered to conduct those activities under the supervision of the Gambino family, and DiLeo complained to Corallo, the boss of the Lucchese family. Several recorded conversations show that DiLeo asked Corallo to intercede with Paul Castellano and the Gambino family to resolve this dispute. At Corallo's direction, Santoro and Salvatore Avellino, Corallo's driver, met with Paul Castellano and two other Gambino family members. As a result, the Lucchese and Gambino families reached an accord allowing DiLeo to continue his illegal activities on Staten Island as long as he was not doing so on his own; he was to report to Corallo, and the Gambino family was to be kept informed concerning DiLeo's activities. DiLeo was subsequently ordered by Corallo to continue reporting to him, and surveillance photographs show that DiLeo did in fact continue to meet with Avellino and Corallo after the accord was reached.
 
 
 10
 The third scheme involved the murder of Carmine Galante and his associates, Giuseppe Turano and Leonard Coppola, on July 12, 1979, allegedly as part of a Commission plan to end the internal Bonanno family dispute between Galante and Philip Rastelli. Only Indelicato, the alleged hit man, was charged with the murders of Galante and his associates as predicate acts in the RICO counts. The three men were shot, allegedly by Indelicato and several accomplices, while they were sitting together on the terrace of Turano's restaurant in Brooklyn. A palmprint on the door handle of the getaway car, as well as eyewitness reports and expert testimony, tied Indelicato to the murders. The government introduced surveillance evidence showing that Indelicato, a Bonanno family member, reported to Gambino family underboss Aniello Dellacroce and Bonanno family consigliere Stefano Canone approximately one-half hour after the killings. Dellacroce and Canone were originally named as defendants, but both died of natural causes in 1985. The murders were the only predicate acts with which Indelicato was charged.
 
 
 11
 Further factual matters will be set forth in the discussion of the particular issues to which they relate.
 
 Discussion
 
 12
 Appellants urge numerous grounds for reversal. The ones which merit consideration are: (a) claims of insufficiency of the evidence as to (1) extortion, (2) Corallo's involvement in the Club operations, (3) loansharking conspiracy, and (4) the nexus of the predicate acts of murder to the Commission; (b) Indelicato's claim that his prosecution for substantive RICO and RICO conspiracy violations is barred by the applicable statute of limitations; (c) challenges to the admissibility of certain evidence; (d) claims by Corallo, Salerno and Santoro that certain exculpatory tape recordings were erroneously excluded; (e) double jeopardy and jurisdictional claims asserted by Persico and Langella; (f) a claim by Persico that the jury should have been sequestered for the entire trial, rather than only during its deliberations; (g) a claim by Furnari that his counsel was burdened by a conflict of interest which requires a new trial; (h) a claim by all appellants that certain Brady material was improperly withheld by the government, necessitating a new trial; and (i) challenges by all defendants to the severity of their sentences. Indelicato also raised a substantial question whether the simultaneous murders of Carmine Galante, Leonard Coppola and Giuseppe Turano constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. Sec. 1962(c) (1982); as indicated earlier, this question was determined by the Second Circuit in banc, rather than by this panel.
 
 
 13
 A. Claims as to Insufficiency of the Evidence.
 
 
 14
 Before considering appellants' specific claims as to insufficiency of the evidence, it is important to review the general standards by which these contentions are to be assessed. As we stated in United States v. Badalamenti, 794 F.2d 821 (2d Cir.1986):
 
 
 15
 [I]n evaluating [such] claim[s], we must view the evidence in the light most favorable to the government and construe all possible inferences in its favor, see, e.g., United States v. Martino, 759 F.2d 998, 1002 (2d Cir.1985). If "any rational trier of fact could have found the essential elements of the crime," the conviction must stand. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2786, 61 L.Ed.2d 560 (1979) (emphasis in original).
 
 
 16
 Id. at 828. Furthermore,
 
 
 17
 It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. United States v. Manton, 2 Cir., 107 F.2d 834, 839, and cases cited.
 
 
 18
 Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a "development and collocation of circumstances." United States v. Manton, supra.
 
 
 19
 Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); see Burks v. United States, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978).
 
 
 20
 We now turn to appellants' specific assertions of insufficiency.
 
 
 21
 1. Claimed Insufficiency as to Extortion (predicate acts 5 and 8-13, counts 10 and 16-21).
 
 
 22
 All appellants except Indelicato were convicted on thirteen counts of extortion or attempted extortion, 18 U.S.C. Sec. 1951(a) (1982), which also correspond to predicate acts in the two RICO counts. These counts concern the "Club" scheme, according to which concrete construction companies were allegedly coerced into paying the Commission two percent of any contract over two million dollars. In exchange, the Commission "guaranteed" labor peace, enforceable primarily through its control over the District Council, of which appellant Scopo was president and business manager. Appellants concede that the evidence was sufficient on five counts, involving victims X.L.O. Concrete Corp. (counts 4, 6 and 8) and Technical Concrete Construction Corp. (counts 12 and 14), principals of which testified at trial.[1] As to the remaining seven counts, involving Century-Maxim Construction Corp. (count 10), Cedar Park Concrete Corp. (count 16), North Berry Concrete Corp. (count 17), G & G Concrete Corp. (count 18) and S & A Concrete Company, Inc. (counts 19-21), appellants argue that the government failed to prove either that payments were made, or that any payments were made by the contractors "out of a reasonable fear of retaliation if they failed to do so," citing United States v. Daley, 564 F.2d 645, 650 (2d Cir.1977), cert. denied, 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978); United States v. Rastelli, 551 F.2d 902, 904-05 (2d Cir.), cert. denied, 434 U.S 831, 98 S.Ct. 115, 54 L.Ed.2d 91 (1977); and United States v. Tolub, 309 F.2d 286, 289 (2d Cir.1962).
 
 
 23
 Appellants were charged, however, with both extortion and attempted extortion, 18 U.S.C. Sec. 1951(a) (1982), and it is accordingly not necessary to prove the victims' actual fear of retaliation, but "only an attempt to instill fear." United States v. Gambino, 566 F.2d 414, 419 (2d Cir.1977) (citing Carbo v. United States, 314 F.2d 718, 740-41 (9th Cir.1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964)), cert. denied, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). Moreover, the government need not prove an attempt to instill fear of violence, but need only prove an attempt to instill fear of economic harm. See United States v. Capo, 817 F.2d 947, 951 (2d Cir.1987) (in banc).
 
 
 24
 To prove such an attempt, the government introduced evidence establishing that all five of the victims in the disputed counts were members of the Club and that the Commission required that all Club members pay the two percent tribute. There was also specific evidence, as to each of these five companies, that the Commission took measures to enforce their obedience to Commission rule. Recorded conversations revealed that: Century-Maxim Construction Corp. was compelled to "pa[y] a penalty ... [b]ecause they robbed the Families"; Cedar Park Concrete Corp. was forced to go out of the concrete business because it would no longer make payments; an associate reported to Scopo about having "made North Berry [Concrete Corp.] pay the money"; Salerno, Santoro and other associates actively monitored the status of payments by G & G Concrete Corp. and set a Commission meeting to discuss dissatisfaction with payments by G & G and others; and S & A Concrete Company, Inc. could take no job without prior approval by a Commission representative. In sum, "the evidence was plain that nonpayment [of the two percent tribute] would result in preclusion from or diminished opportunity for some existing or potential economic benefit." United States v. Capo, 817 F.2d at 951.
 
 
 25
 The fact, moreover, that persons known by the victims to be organized crime figures established and coordinated the elaborate work allocation and payment scheme reinforces the conclusion that the scheme involved at least an attempt to instill fear. See Carbo v. United States, 314 F.2d at 740-41 (reputation for dangerousness of underworld figure relevant to issue whether there was an instillation of fear). In this connection, we note that officers of Technical Concrete Construction Corp. and X.L.O. Concrete Corp. testified that Scopo and the Commission used the threat of labor unrest, the disruption of concrete supplies, and the defendants' reputation for violence to enforce the rules of the Club.
 
 
 26
 2. Claimed Insufficiency as to Corallo's Involvement with the Club (predicate acts 1-13 and counts 3-21).
 
 
 27
 Corallo contends that the evidence was insufficient to establish his involvement in the "Club," and therefore to convict him on the extortion and labor bribery predicates and substantive counts. Corallo bases this contention upon the assertion that the tape recordings from Corallo's Jaguar automobile do not implicate him in Club activities. This claim is without merit, however, since the other evidence on this point was ample. The evidence other than the Jaguar tapes demonstrated that Corallo was a Commission member and that the Commission directed the Club; that Corallo specifically discussed disputes concerning payments from concrete manufacturing companies with Salerno and Santoro; that Corallo's Lucchese family consigliere, appellant Furnari, participated in a meeting with Salerno's representatives at which the Club scheme was extensively discussed and reference was made to Corallo as having participated in the operation of the scheme; and that Corallo was included among those bosses who were to meet to discuss interfamily problems with regard to the concrete construction operations.
 
 
 28
 3. Claimed Insufficiency as to Loansharking Conspiracy (predicate act 17 and count 22).
 
 
 29
 Corallo and Santoro contend that the evidence of their intercession, on behalf of John DiLeo, in a "turf" dispute with the Gambino family concerning DiLeo's loansharking activities in Staten Island is not sufficient to sustain the jury's findings on the loansharking conspiracy and predicates. We conclude, however, that the jury could reasonably determine that the object of the dispute resolution was to facilitate DiLeo's loansharking activities and make them succeed, and that this suffices as a violation of 18 U.S.C. Sec. 892 (1982).
 
 
 30
 Corallo and Santoro, through their intercession with the Gambino family, certainly made continued loansharking activity in Staten Island possible for DiLeo. Corallo's driver, Avellino, stated his understanding of the accord reached with the Gambino family in a recorded conversation: "What I meant, what he [Jimmy Brown, a Gambino representative at a Lucchese-Gambino meeting concerning the DiLeo matter] mean, to say, he doesn't want him to go out, uhh bookingmaking or shylocking or, or, uhh, running games or anything else like that. He says, uhh, 'On....' You know, 'On his own, on his own,' he meant to say." (Emphasis added.) The arrangement contemplated that DiLeo, a nephew of Corallo, could continue "shylocking" on Staten Island, without the Gambino family having any "claim" on him, as long as the activity was "on the record" and reported to the Lucchese family. Corallo explicitly told DiLeo that, should the Gambino family want "a favor or something" from him he should "check with us." DiLeo then stated to Corallo that "I gotta come back ... to you." There was surveillance evidence of subsequent meetings between DiLeo and Avellino.
 
 
 31
 The evidence is therefore sufficient to show a "working relationship" between appellants and DiLeo, United States v. Peltz, 433 F.2d 48, 51 (2d Cir.1970), cert. denied, 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971), and to show that Corallo and Santoro were actively interested in helping DiLeo succeed. Even if the evidence is not conclusive that Corallo and Santoro contemplated any direct or immediate remuneration for their help in smoothing the way for DiLeo, that does not mean that Corallo and Santoro were not co-conspirators. See United States v. Peltz, 433 F.2d at 51 ("unnecessary to a conspiracy that the relationship contemplated mutual benefit"); see also United States v. Cassino, 467 F.2d 610, 617 (2d Cir.1972) (evidence of "stake" in the venture sufficient where defendant protected venture from official interference, gave advice about operations, showed concern about loyalty of personnel, and sought to make venture succeed), cert. denied, 410 U.S 928, 93 S.Ct. 1363, 35 L.Ed.2d 590 (1973). See generally United States v. Zambrano, 776 F.2d 1091, 1094-96 (2d Cir.1985).
 
 
 32
 The evidence is also sufficient to establish the required nexus or connection between appellants' dispute-resolving activity in the DiLeo affair and the Commission enterprise.[2] See, e.g. United States v. Robilotto, 828 F.2d 940, 947-48 (2d Cir.1987) (citing cases), cert. denied, --- U.S. ----, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988). The jury could reasonably conclude that the efforts of Corallo and Santoro were not only related to the Commission's activities, id. at 948, but actually furthered the Commission's goal of arbitrating interfamily disputes and coordinating criminal activities among the families.
 
 
 33
 4. Claimed Insufficiency as to Relationship of the Galante Murders (predicate acts 14-16) to the Commission Enterprise.
 
 
 34
 Appellants contend that there was insufficient evidence of a nexus between the Commission and the murders of Carmine Galante, Leonard Coppola and Giuseppe Turano.[3] Only Indelicato was charged with these murders (as predicate acts 14-16), which in turn supported his conviction on counts one (RICO conspiracy) and two (substantive RICO) of the indictment. Indelicato claims that since there was inadequate proof of the required connection between the murders and the Commission enterprise, his RICO convictions cannot stand. The other appellants contend that this being so, there was prejudicial misjoinder, especially considering the inflammatory nature of the evidence concerning the murder of Galante and his associates. We conclude, however, that there was adequate proof of the Commission connection, and therefore reject both of these claims.
 
 
 35
 The requirement of connection to a RICO enterprise is satisfied if the evidence is sufficient to establish either that the defendant "is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise," or that "the predicate offenses are related to the activities of that enterprise." United States v. Scotto, 641 F.2d 47, 54 (2d Cir.1980), cert. denied, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981); see United States v. Robilotto, 828 F.2d 940, 947-48 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988). The evidence here is clearly sufficient to establish the second alternative, i.e., that the violent elimination of Galante as boss of the Bonanno family was related to the Commission function of resolving leadership disputes within a family (here, the fractious Bonanno family which had been under close Commission superintendence for some time).
 
 
 36
 The testimony of Fred DeChristopher concerning appellant Persico's statement that he had voted against the Galante murder provided evidence that the Commission had taken a vote on the matter. This was consistent with other background evidence introduced at trial to the effect that the Commission retained for itself an exclusive prerogative to approve any murders of family bosses. Moreover, there was evidence at trial that the Commission had established a "death penalty" for anyone who might murder a boss without prior Commission approval. After the Galante murders, however, Indelicato was not eliminated, but was promoted by the Commission to the rank of "capo".
 
 
 37
 There was other specific evidence of Commission involvement in the Galante murders. The murders were a product of multifamily coordination, which is one of the functions of the Commission. In addition to the foreknowledge of the boss of the Colombo family (Persico), there was evidence that the murder was foreknown by another member of the Colombo family (Andrew Russo). The jury also viewed a surveillance tape of Indelicato being congratulated by Bonanno family consigliere Stefano Canone, and consulting with Gambino family underboss Aniello Dellacroce, at the Gambino headquarters less than half an hour after the murders.
 
 
 38
 Finally, there was testimony from an undercover agent that, because of the Bonanno family's internal dissension and instability, the Commission controlled that family very closely. At the time of the murder, there was an internal dispute between rival Bonanno bosses Philip Rastelli and Galante. There was specific testimony that after Galante was murdered, the Commission actively reorganized the Bonanno family under Rastelli and returned autonomous control to the family for the first time in a decade. The jury could reasonably conclude that the Commission approved the murder of Galante in order to resolve the Rastelli-Galante dispute and to restore order and autonomy to the Bonanno family.
 
 
 39
 We conclude that there was adequate evidence to support the jury's determination that the Galante murders occurred "in the conduct of [the Commission's] affairs" within the meaning of 18 U.S.C. Sec. 1962(c) (1982).
 
 
 40
 B. Indelicato's Claim that his RICO Conspiracy and Substantive RICO Convictions were Barred by the Statute of Limitations.
 
 
 41
 Indelicato was indicted on RICO conspiracy and substantive RICO counts on November 19, 1985. All three of his alleged racketeering acts, however, occurred in 1979. Indelicato contends that his convictions on both the substantive RICO and RICO conspiracy counts are barred by the applicable five-year statute of limitations, 18 U.S.C. Sec. 3282 (1982). See United States v. Srulowitz, 785 F.2d 382, 390 (2d Cir.1986), cert. denied, --- U.S. ----, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987). The jury was charged that in order to convict Indelicato on the RICO conspiracy count, it must find that the Commission enterprise continued to exist after November 19, 1980, and that Indelicato continued after that date to be a coconspirator or associate of that enterprise. It was charged that in order to convict him on the substantive RICO count, it must find that he continued to be an associate of the Commission enterprise after November 19, 1980, and that any one of the other defendants found to be guilty under the substantive RICO count committed a racketeering act after November 19, 1980.
 
 
 42
 Subsequent to oral argument, this court decided in United States v. Persico, 832 F.2d 705 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988), that a RICO conspiracy offense is complete, thus commencing the running of the five-year statute of limitations, only when the purposes of the conspiracy have either been accomplished or abandoned, id. at 713,[4] but that a substantive RICO charge is barred by limitations as to any defendant unless that defendant committed a predicate act within the five-year limitations period, id. at 714. We are, of course, bound by Persico, as by any Second Circuit panel decision unless it is overruled in banc or by the Supreme Court. Board of Educ. v. Hufstedler, 641 F.2d 68, 70 (2d Cir.1981).
 
 
 43
 The jury here was properly charged that the conspiracy count against Indelicato must be dismissed on statute of limitations grounds unless they found that the Commission enterprise continued after November 19, 1980, and that Indelicato continued after that date as a coconspirator or an associate of that enterprise. There was ample evidence to support its determinations adverse to Indelicato on those issues. Accordingly, and pursuant to the in banc determination of this court, Indelicato's conviction for violation of 18 U.S.C. Sec. 1962(d) (1982) (RICO conspiracy) will be affirmed. On the other hand, since all predicate acts committed by Indelicato occurred prior to November 19, 1980, Persico requires reversal of his conviction for violation of 18 U.S.C. Sec. 1962(c) (1982) (substantive RICO) on limitations grounds.
 
 
 44
 C. Objections to the Admission of Certain Evidence.
 
 
 45
 A great deal of the government's evidence at trial consisted of recorded conversations. In addition, the government presented live testimony by, inter alia, Angelo Lombardo, a former acting boss of the Cleveland La Cosa Nostra family; three law enforcement witnesses who testified concerning an organized crime meeting in Appalachia, New York in 1957; Joseph Cantalupo, a former member of the Colombo family who provided both his own testimony and recordings of conversations with others; Fred DeChristopher, a cousin by marriage of defendant Persico at whose home Persico stayed while a fugitive from November, 1984 to February, 1985; and Joseph Pistone, an undercover FBI agent who successfully infiltrated the Bonanno family and, like Cantalupo, provided both his own testimony and recordings of conversations with others.
 
 
 46
 Appellants contend that much of the foregoing evidence was improperly admitted. They assert that many statements were deemed admissible, as "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy" pursuant to Fed.R.Evid. 801(d)(2)(E), which were not in fact "in furtherance of the conspiracy" charged against the defendants. While conceding that these statements, when made by a defendant, were admissible against that defendant as an admission against interest pursuant to Fed.R.Evid. 801(d)(2)(A), appellants contest their admissibility against all defendants. The government properly responds that if the statements in question met the requirements of Fed.R.Evid. 804(b)(3) as statements against penal interest, or of Fed.R.Evid. 801(d)(2)(E), they were admissible against all defendants.
 
 
 47
 Appellants also claim that a great deal of irrelevant evidence was improperly admitted. Their primary contention in this regard is that evidence was admitted which pertained to the activities of individual La Cosa Nostra families, but bore no relevance to the overarching Commission which was the RICO "enterprise" charged in this case. Appellants cite on this point United States v. Langella, 804 F.2d 185 (2d Cir.1986), in which this court determined that the indictment of defendants Langella and Persico in this case did not place them in double jeopardy, despite their conviction at a prior trial relating to extortion by the Colombo family with respect to concrete construction companies working in New York City on jobs involving less than two million dollars. We concluded in United States v. Langella, inter alia, that the Colombo family and Commission enterprises alleged in the two indictments were distinct. Id. at 189. Appellants contend that a fair application of the Langella precedent at the trial of this case would have resulted in the exclusion of considerable evidence that Judge Owen erroneously admitted.
 
 
 48
 We address first appellants' contention that coconspirator statements were erroneously admitted against all defendants because those statements were not "in furtherance of the conspiracy" within the meaning of Fed.R.Evid. 801(d)(2)(E). This issue was also addressed in United States v. Persico, 832 F.2d 705, 715-16 (2d Cir.1987), subsequent to oral argument in this case. In Persico, an 801(d)(2)(E) challenge was addressed by all defendants to testimony by Fred DeChristopher concerning statements made by Carmine Persico to DeChristopher while Persico was a fugitive in hiding at DeChristopher's house, paralleling one of the contentions made by appellants here. Rejecting that challenge, we said:
 
 
 49
 We ... find no error in Judge Keenan's determination that Carmine Persico's statements to DeChristopher were in furtherance of the conspiracy. DeChristopher already was a member of the conspiracy at the time Carmine Persico came to stay at his house, having been involved in the Colombo Family's efforts to skim the gambling profits of a cruise ship. Persico's statements to DeChristopher regarding the activities of the enterprise and the various roles of appellants in it clearly were in furtherance of the enterprise. Among other purposes, the statements "prompt[ed DeChristopher] to respond in a way that facilitate[d] the carrying out of criminal activity," [United States v.] Rahme, 813 F.2d [31, at] 35 [ (2d Cir.1987) ] (citing United States v. Katsougrakis, 715 F.2d 769, 778 (2d Cir.1983), cert. denied, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984)), informed DeChristopher of the "current status of the conspiracy," id. at 35-36 (quoting United States v. Ammar, 714 F.2d 238, 252 (3d Cir.), cert. denied, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983)), apprised him of the progress of the conspiracy and solicited his assistance, id. at 36 (citing [United States v.] Paone, 782 F.2d [386, at] 391 [ (2d Cir.), cert. denied, 479 U.S. 107, S.Ct. 269, 93 L.Ed.2d 246; --- U.S. ----, 107 S.Ct. 3261, 97 L.Ed.2d 761 (1986) ], and informed DeChristopher of the identity and activities of his coconspirators, id. (citing, inter alia, United States v. Perez, 702 F.2d 33, 37 (2d Cir.), cert. denied, 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1336 (1983)).
 
 
 50
 United States v. Persico, 832 F.2d at 716.
 
 
 51
 These standards accord with the general authority in this area. In addition to United States v. Rahme and United States v. Paone, cited immediately supra in Persico, see United States v. Blackmon, 839 F.2d 900, 912-13 (2d Cir.1988) (statements that brief a coconspirator on current status of conspiracy are in furtherance of conspiracy); United States v. Ruggiero, 726 F.2d 913, 924 (2d Cir.) (statement to an undercover agent believed to be a coconspirator describing three previous murders found to be in furtherance of the conspiracy), cert. denied, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); United States v. Perez, 702 F.2d 33, 37 (2d Cir.) (statement concerning the composition of a partnership held to be in furtherance of conspiracy because it prepared a coconspirator for his role), cert. denied, 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1336 (1983); see also United States v. Mangan, 575 F.2d 32, 44 (2d Cir.) (statements giving a general description of the conspiracy construed as enlisting coconspirator or briefing him on the scheme, thus satisfying the "in furtherance" requirement), cert. denied, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978); United States v. Annunziato, 293 F.2d 373, 380 (2d Cir.) (statements concerning illegal payments construed as informing son about father's policies should a similar situation arise in the future, and thus in furtherance of conspiracy to make payments), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961).
 
 
 52
 Appellants contend, however, that certain trial testimony and many of the recorded conversations admitted at trial consisted of mere "idle chatter" or purely narrative descriptions of past events that in no way furthered the conspiracy. See United States v. Lieberman, 637 F.2d 95, 103 (2d Cir.1980) ("in furtherance" requirement not satisfied by conversation that amounts to no more than idle chatter); United States v. Birnbaum, 337 F.2d 490, 495 (2d Cir.1964) (mere narrative account of past activities not in furtherance of conspiracy). But see United States v. Paone, 782 F.2d at 390-91 (narratives of past events satisfy Rule 801(d)(2)(E) when they apprise coconspirator of progress of conspiracy or are designed to induce his assistance); United States v. Ruggiero, 726 F.2d at 924 (surrounding circumstances establish that accounts of past murders were made in furtherance of conspiracy).
 
 
 53
 An examination of the recorded conversations and trial testimony challenged by appellants as violative of Rule 801(d)(2)(E) does not sustain their contentions. Many of the challenged recordings include discussions by defendants and their associates concerning the progress of law enforcement investigations into the Commission's affairs, monitoring of the indictment and arrest of coconspirators, and assessments of revelations by the media concerning the Commission, including the highly damaging confessions of former Commission member Joseph Bonanno on the television program "60 Minutes." See United States v. DePeri, 778 F.2d 963, 981-82 (3d Cir.1985) (statements of coconspirators apprising each other of efforts to avoid indictment and conviction are in furtherance of conspiracy), cert. denied, 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986). While recorded conversations of Corallo, Avellino and Santoro concerning the Bonanno interview included many comments by the declarants about the history and rules of the Commission, these admissions were not idle chatter or mere narrations of past events, but rather contributed to an assessment of what Bonanno had and had not revealed about the Commission, and the impact of the revelations. A number of the recorded conversations include discussions by Commission members or associates about interfamily disputes and how to resolve them. These discussions furthered the Commission's purpose, as specifically alleged in the indictment, of resolving disputes and coordinating criminal activities among the families in New York and other American cities.[5]
 
 
 54
 In many of the conversations, Commission members and high ranking members of individual families discuss the identities and consider the qualifications of various candidates for "made" status within La Cosa Nostra. The evidence at trial clearly established that the Commission made the final decisions about who would be accepted as "made" members of the various families. Other conversations include discussions of Commission rules and structure, which served the Commission conspiracy by educating family members concerning Commission policy and control, thus insuring obedience and knowledgeable participation within the highly structured and secretive criminal network. See United States v. Rahme, 813 F.2d at 35-36 (statements that maintain cohesiveness among conspirators are in furtherance of the conspiracy).
 
 
 55
 The testimony of witnesses Lonardo, Cantalupo, DeChristopher, and Pistone, including tape recordings of conversations in which Cantalupo and Pistone participated, relayed statements made to them by coconspirators concerning the rules, operating structure and past practices of La Cosa Nostra and the Commission. Like the statements in the recordings, these were not just casual admissions about past facts, but furthered the Commission conspiracy by educating initiates in the ways of the organization to which they were ultimately answerable.
 
 
 56
 Appellants particularly object to the testimony of DeChristopher concerning statements made to him by Persico when Persico was hiding out in DeChristopher's home, and by another Colombo family member, Andrew Russo. The trial court specifically instructed the jury that the statements of Russo concerning Colombo family affairs were not offered against any defendant but were only admissible as background on DeChristopher's initial involvement with Russo. Russo made those statements when he was cultivating DeChristopher for service to the Colombo family, which ultimately led to service of the Commission when DeChristopher was selected to harbor Persico, a Commission member. Given the limiting instruction, there was no error in admitting the Russo statements.
 
 
 57
 As for Persico's statements to DeChristopher, it is obvious that DeChristopher's house had become Persico's base of operations. Accordingly, Persico had to tell DeChristopher who to trust, who could come to the house, and who held what positions in the Colombo family. He also had to brief DeChristopher on the organizational workings of the Commission. See United States v. Persico, 832 F.2d at 716 (finding statements made by Persico to DeChristopher while Persico was hiding out in DeChristopher's house to be in furtherance of Colombo Family racketeering conspiracy).
 
 
 58
 We conclude that appellants' contentions based upon alleged failure to comply with Fed.R.Evid. 801(d)(2)(E) are unavailing, and we therefore need not address the government's alternative position that the challenged evidence was admissible against all defendants pursuant to Fed.R.Evid. 804(b)(3). We note in this connection that since the "in furtherance" issue is essentially factual, we will not reverse the district court's determination of that issue unless it is clearly erroneous. United States v. Persico, 832 F.2d at 716; United States v. Rahme, 813 F.2d at 36. Further, even if arguendo there were some evidence that was erroneously admitted in the course of this lengthy trial, it would be unlikely that reversible error resulted. United States v. Paone, 782 F.2d at 391. We note finally, as appellants concede, that the opinion of the Supreme Court in Bourjaily v. United States, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), conclusively establishes that "the Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)." Id. 107 S.Ct. at 2783 (footnote omitted).
 
 
 59
 Appellants' claims as to relevance fare no better. Appellants' basic contention in this regard, premised upon the determination in United States v. Langella, 804 F.2d 185 (2d Cir.1986), cert. denied, --- U.S. ----, 109 S.Ct. 532, 102 L.Ed.2d 564 (1988), that the Commission and the Colombo family are distinct RICO enterprises for double jeopardy purposes, is misconceived. Where the alleged purpose of the Commission enterprise as stated in the indictment is "to regulate and facilitate the relationships between and among La Cosa Nostra families," it is obvious that proof concerning the essential "enterprise" element of the charged RICO offenses will entail considerable evidence relating to those families, even though the individual families are (as determined in United States v. Langella ) separate RICO enterprises from the Commission. Cf. United States v. DeFillipo, 590 F.2d 1228, 1234 (2d Cir.) (admissibility of prior conspiracy conviction as evidence of similar act not inconsistent with treatment of two conspiracies as separate for double jeopardy purposes), cert. denied, 442 U.S. 920, 99 S.Ct. 2844, 61 L.Ed.2d 288 (1979); United States v. Booth, 673 F.2d 27, 30 (1st Cir.) (same), cert. denied, 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982). Accordingly, and especially since we review the trial court's rulings as to relevance only for abuse of discretion, see United States v. Sindona, 636 F.2d 792, 800 (2d Cir.1980), cert. denied, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981), we find no merit in appellants' evidentiary objections premised upon United States v. Langella.
 
 
 60
 D. Claim that Exculpatory Evidence was Erroneously Excluded.
 
 
 61
 Corallo, Salerno and Santoro claim that the district court abused its discretion in excluding three tape recordings in which Salerno and others discussed defendant Scopo's relationship to Technical Concrete Construction Company and Scopo's indictment in another case involving construction companies, and in denying their motion for severance based upon that exclusion. Judge Owen found that the evidence had little if any probative value, and that the evidence prejudiced other defendants in the case by bringing up the prior indictment which implicated codefendants Scopo, Persico and Langella. The evidence could only have had the questionable value of showing that Corallo, Salerno and Santoro may not have been involved in another conspiracy charged in another indictment that was in some ways similar to the conspiracy charged in this case, but which differed in the essential aspect that the contracts were for less than two million dollars and thus did not implicate the Commission and its two percent rule. Given the limited value of the evidence to Corallo, Santoro and Salerno, and the high degree of prejudice to codefendants from this similar act evidence, the trial judge did not abuse his discretion. Also, given Judge Owen's assessment of the lack of significant probative value, it was not an abuse of discretion for him to deny the motion to sever the case against Corallo, Santoro and Salerno after he excluded their proffered evidence.
 
 
 62
 E. Double Jeopardy and Jurisdictional Claims Asserted by Persico and Langella.
 
 
 63
 Persico and Langella renew the double jeopardy argument advanced in their unsuccessful motion to dismiss the indictment, the denial of which motion was affirmed in United States v. Langella, 804 F.2d 185 (2d Cir.1986), cert. denied, --- U.S. ----, 109 S.Ct. 532, 102 L.Ed.2d 564 (1988). They have shown us no reason to depart from Langella.
 
 
 64
 By supplemental brief filed with the court's permission, however, Persico and Langella raise a related argument that because the mandate of this court did not issue in Langella until after they were tried in this case, the district court proceeded without jurisdiction in that trial and their resulting convictions are consequently void.
 
 
 65
 Following their conviction in Langella on June 13, 1986, Persico and Langella moved to dismiss the indictment against them in this case on grounds of double jeopardy. Judge Owens denied that motion, an expedited appeal was taken to this court, as authorized by Abney v. United States, 431 U.S. 651, 662, 97 S.Ct. 2034, 2041, 52 L.Ed.2d 651 (1977), and we issued an order on September 8, 1986 which stated:
 
 
 66
 Appellants Gennaro Langella and Carmine Persico appeal from the denial of their motions to dismiss the indictment against them on double jeopardy grounds. The Court, having rejected the contentions of appellants, and trial of the indictment having been scheduled to begin on September 8, 1986, it is
 
 
 67
 ORDERED, that the order of the United States District Court for the Southern District of New York, Richard B. Owen, Judge, be, and hereby is, affirmed in all respects, a formal opinion to be issued by the panel at a later date.
 
 
 68
 The contemplated formal opinion was issued on October 30, 1986, and the mandate of this court thereafter issued on November 18, 1986. The trial in the district court ended the next day, when guilty verdicts were returned against all defendants.
 
 
 69
 Persico and Langella seek to invoke United States v. Rivera, 844 F.2d 916 (2d Cir.1988), and particularly the statement in that case that: "Simply put, jurisdiction follows the mandate." Id. at 921. They contend that since the mandate of this court did not issue until the virtual conclusion of their trial in the district court, that court proceeded without jurisdiction as to them, as a result of which their convictions are void and they are entitled to a new trial.
 
 
 70
 Rivera, however, interpreted a provision of the Speedy Trial Act which states that:
 
 
 71
 If the defendant is to be tried again following an appeal, ... the trial shall commence within seventy days from the date the action occasioning the retrial becomes final.
 
 
 72
 18 U.S.C. Sec. 3161(e) (1982) (emphasis added). Rivera held that in circumstances akin to those presented here, where an order was followed by a formal opinion and the mandate thereafter issued, the action of this court with respect to the appeal became "final" within the meaning of section 3161(e) upon issuance of the mandate, in accordance with the rule adopted by the seven other circuits which had considered the issue. Rivera, 844 F.2d at 920 (collecting cases).[6] Rivera distinguished the question presented by the prosecution of Persico and Langella in this case, id. at 921-22, which question we now address.
 
 
 73
 Numerous circuit courts have ruled that a district court may retain jurisdiction to proceed with a trial, despite the pendency of a defendant's interlocutory double jeopardy appeal, where the appeal is found to be frivolous. See, e.g., United States v. Black, 759 F.2d 71, 73 (D.C.Cir.1985); United States v. Cannon, 715 F.2d 1228, 1231 (7th Cir.1983), cert. denied, 464 U.S. 1045, 104 S.Ct. 716, 79 L.Ed.2d 178 (1984); United States v. Head, 697 F.2d 1200, 1204 & nn. 3-5 (4th Cir.1982), cert. denied, 462 U.S. 1132, 103 S.Ct. 3113, 77 L.Ed.2d 1367 (1983); United States v. Hines, 689 F.2d 934, 936-37 (10th Cir.1982); United States v. Bizzard, 674 F.2d 1382, 1385 (11th Cir.), cert. denied, 459 U.S. 973, 103 S.Ct. 305, 74 L.Ed.2d 286 (1982); United States v. Grabinski, 674 F.2d 677, 679 (8th Cir.) (in banc), cert. denied, 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 67 (1982); United States v. Lanci, 669 F.2d 391, 394 (6th Cir.), cert. denied, 457 U.S. 1134, 102 S.Ct. 2960, 73 L.Ed.2d 1350 (1982); United States v. Leppo, 634 F.2d 101, 105 (3d Cir.1980); and United States v. Dunbar, 611 F.2d 985, 987-88 (5th Cir.) (in banc), cert. denied, 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980).
 
 
 74
 Persico and Langella contend, however, that their double jeopardy appeal in Langella was not frivolous, as this court in effect certified by issuing a formal opinion of affirmance, so these cases have no application here. We disagree. Clearly, in all these cases, (1) no mandate had issued "restoring" jurisdiction to the district court, since trial was allowed to proceed simultaneously with the pendency of the interlocutory appeal, and (2) the trial was allowed to proceed because of the high likelihood, in view of the meritless nature of the appeal, that the district court's ruling on double jeopardy would be affirmed. Here, however, that likelihood hardened into a certitude when this court issued its order on September 8, 1986 affirming the district court's denial of Persico and Langella's double jeopardy motion. Furthermore, the applicable "divestiture of jurisdiction rule is not based upon statutory provisions or the rules of civil or criminal procedure. Instead, it is a judge made rule originally devised in the context of civil appeals to avoid confusion or waste of time resulting from having the same issues before two courts at the same time." United States v. Claiborne, 727 F.2d 842, 850 (9th Cir.), cert. denied, 469 U.S. 829, 105 S.Ct. 113, 83 L.Ed.2d 56 (1984); see United States v. Leppo, 634 F.2d at 104. On the admittedly unusual facts here presented, we conclude that the district court had jurisdiction to proceed with the trial of Persico and Langella on September 8, 1986.
 
 
 75
 As to the claimed conflict with Rivera, we note that of the nine circuits cited above which allow concurrent jurisdiction in district courts during the pendency of frivolous interlocutory appeals on double jeopardy grounds, the five which have considered the question, as well as two other circuits, have ruled that the Speedy Trial Act mandate commences to run only upon the issuance of the circuit court's mandate terminating an interlocutory appeal (or, in the case of the Eleventh Circuit, upon the district court's receipt of it; see supra note 6). See Rivera, 844 F.2d at 920 (collecting cases); see also United States v. Ferris, 751 F.2d 436, 440-41 (1st Cir.1984) (district court retains jurisdiction during appeals of "patently nonappealable orders," but appeals nonetheless suspend running of speedy trial clock).
 
 
 76
 F. Jury Sequestration.
 
 
 77
 Persico's claim that Judge Owen committed reversible error by refusing to sequester the jury for the entire eleven week trial, rather than merely for the five days of deliberation, is without merit. The decision to sequester the jury to avoid exposure to publicity is committed to the discretion of the court, and failure to sequester the jury can rarely be grounds for reversal. United States v. Johnson, 584 F.2d 148, 154-55 (6th Cir.1978), cert. denied, 440 U.S. 918, 99 S.Ct. 1240, 59 L.Ed.2d 469 (1979). Persico attempted no showing of actual prejudice from publicity surrounding the trial, and this is fatal to his claim. See Johnson, 584 F.2d at 155; United States v. Hill, 496 F.2d 201, 203 (5th Cir.1974) (exercise of judge's discretion in sequestration decision will result in reversal only upon a showing of actual prejudice to the accused). We find no abuse of discretion, especially since Judge Owen repeatedly gave the jury explicit instructions not to read anything, watch anything on television, or listen to anything on the radio concerning the case. Furthermore, Persico cites no legal authority for his alternative and inherently implausible contention that it was impermissibly coercive to sequester the jury during deliberations once the decision had been made not to sequester them during the balance of the trial.
 
 
 78
 G. Furnari's Claims as to his Counsel's Alleged Conflict of Interest.
 
 
 79
 Furnari contends that his motion for a new trial should have been granted because of alleged conflicts of interest affecting his attorney, James LaRossa. Furnari asserts that LaRossa was cooperating with the Justice Department in a criminal investigation in the Eastern District of New York. He further asserts that LaRossa's law firm was under investigation by the United States Attorney for the Southern District of New York with respect to certain medical clinics, had represented former codefendant Castellano, and had once invested in and done legal work for a company called "Metro Concrete" in which Castellano was apparently involved through his son-in-law. None of Furnari's claims meet the test of Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), by demonstrating "that an actual conflict of interest adversely affected his lawyer's performance." Id. at 348, 100 S.Ct. at 1718.
 
 
 80
 In the first place, Furnari waived his objection to LaRossa's previous representation of Castellano after a pretrial Curcio hearing. See United States v. Curcio, 680 F.2d 881 (2d Cir.1982), and United States v. Curcio, 694 F.2d 14 (2d Cir.1982). Moreover, Furnari was advised at the time to consider all aspects of LaRossa's prior relationship, both as an attorney and a business associate and friend, with Castellano.
 
 
 81
 As for LaRossa's involvement in the two investigations being conducted by the Department of Justice, Furnari has not even attempted a showing of an actual conflict of interest or in any way indicated what possible effect there may have been upon his lawyer's trial performance, or how these investigations were in any way related to the present case. Contrast United States v. Cancilla, 725 F.2d 867, 870 (2d Cir.1984) (reversing conviction where defendant's counsel committed crime with a coconspirator of defendant, unbeknown to defendant).
 
 
 82
 Furnari has similarly made no showing of actual conflict or effect on performance resulting from LaRossa's former association with Metro Concrete. LaRossa drafted the incorporation papers for Metro Concrete, and once attempted to invest in the company. Metro was a company with which Castellano had been associated, and for that reason the grand jury had subpoenaed its incorporation papers. Metro, however, was not even mentioned in the indictment in this case. Moreover, given the fact that Furnari was on notice prior to trial concerning LaRossa's business relationship with Castellano, we are even more reluctant to accept his conclusory assertions of conflict stemming from LaRossa's prior legal service to a company with which Castellano was associated.
 
 
 83
 Finally, the denial of Furnari's post-trial motion without a full hearing does not violate United States v. Aiello, 814 F.2d 109, 113-14 (2d Cir.1987). The affidavits in Aiello disclosed sharp disputes and genuine issues of fact as to a conflict of interest, whereas here Furnari's conclusory assertions raised no plausible issue concerning actual conflicts or adverse effects on counsel performance.
 
 
 84
 H. Claims as to Withholding of Brady Material.
 
 
 85
 Appellants contend that the government suppressed FBI reports, and a bail hearing statement in another case made by an Assistant United States Attorney for the Eastern District of New York, in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellants assert that this improperly suppressed evidence would have established that Philip Rastelli, not Carmine Galante, was the boss of the Bonanno family, thus undermining the government's position at trial that the Galante murder was authorized by the Commission, whose rule was that no boss could be murdered without Commission approval. We conclude that the undisclosed evidence was not "material" under the test of United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985): "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. at 682, 105 S.Ct. at 3383; see also id. at 685, 105 S.Ct. at 3385 (White, J., concurring in part and concurring in the judgment).
 
 
 86
 The FBI reports summarized an interview with Anthony Giliberti, a cousin of Philip Rastelli, in which Giliberti indicated that in 1975 or 1976 Rastelli was "head of the Bonanno La Cosa Nostra Family." The bail hearing statement by the Assistant U.S. Attorney included the following:
 
 
 87
 Our position with regard to Mr. Rastelli is not inconsistent. If Mr. Teitler read our letter, we stated that in 1979 Mr. Rastelli became the undisputed boss and that--that he was a boss prior to that. That Mr. [Galante] had tried to establish himself as boss of a rival group to Mr. Rastelli, and that as a result of Mr. [Galante's] murder, Mr. Rastelli once again became undisputed boss.
 
 
 88
 We agree with Judge Owen's conclusions that: (1) there was substantial evidence that the Commission was involved in the Galante murder, whether or not he was the undisputed boss of the Bonanno family; (2) the statement by the Assistant U.S. Attorney actually states that Galante was a boss of the dissent-ridden Bonanno family at the time he was killed; (3) Rastelli was in jail at the time Galante was murdered; (4) the FBI reports dealt with the situation in 1976, and the Assistant U.S. Attorney statement indicates a power struggle within the Bonanno family subsequent to that time; and (5) other evidence indicates that as late as 1984, Rastelli was not yet the undisputed boss of the Bonanno family in the eyes of the Commission. Far from casting doubt on the outcome of the trial, this evidence merely reinforces the government's position that the Bonanno family was in turmoil and required the intervention of the Commission to resolve a dispute between rival bosses.
 
 
 89
 Appellant Persico also argues that the failure of the government to turn over the grand jury testimony of Pasquale Bruno, an officer of Cedar Park Concrete Corporation (extortion victim in predicate act 8 and count 16), and Frederick DeMatteis, an officer of Metro Concrete (not a victim in any count), violated Brady. Persico argues that he was deprived of the opportunity to introduce this testimony pursuant to Fed.R.Evid. 804(b)(1). This argument is without merit.
 
 
 90
 As for Bruno, appellants were informed by the government, during trial, that they might want to interview him--indeed, Corallo's attorney investigated the matter and decided not to pursue it. Appellants never subpoenaed Bruno[7] and never raised the possibility at trial of introducing his grand jury testimony under Rule 804(b)(1).[8] "[N]o Brady violation occurs if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence." United States v. Gaggi, 811 F.2d 47, 59 (2d Cir.) (citations omitted), cert. denied, 482 U.S. 929, 107 S.Ct. 3214, 3233, 96 L.Ed.2d 701 (1987). As for the DeMatteis testimony, Persico merely claims that it would have shown that Metro Concrete was never extorted, which is not surprising or particularly exculpatory, since Metro Concrete was not an alleged victim of the Commission extortion scheme.
 
 
 91
 I. Challenges to Sentences.
 
 
 92
 All appellants, except Indelicato, received prison sentences of one hundred years. Santoro, Persico, Langella, Furnari and Scopo each received consecutive twenty year sentences for Count I (RICO conspiracy),[9] ] Count 2 (substantive RICO)[10], Count 4 (extortion)[11], Count 12 (extortion), and Count 14 (extortion). Corallo and Santoro received consecutive twenty year sentences on Counts 1, 2, 4, 12 and 25 (loansharking conspiracy)[12]. If Judge Owen had not made the sentences on all other counts concurrent, however, these defendants could have received prison terms of over three hundred years. Furthermore, although appellants received a number of consecutive sentences and maximum sentences on several counts, as was stated in Carmona v. Ward, 576 F.2d 405 (2d Cir.1978), cert. denied, 439 U.S. 1091, 99 S.Ct. 874, 59 L.Ed.2d 58 (1979), "[l]ong periods of imprisonment resulting from consecutive sentences for multiple convictions have in the past been upheld as constitutional." Id. at 430 (Oakes, J., dissenting) (collecting cases). See United States v. Jaramillo-Montoya, 834 F.2d 276, 279-80 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1998, 100 L.Ed.2d 229 (1988); United States v. Golomb, 811 F.2d 787, 791 (2d Cir.1987).
 
 
 93
 Appellants nonetheless claim that their sentences violate the eighth amendment. Furnari and Scopo specifically claim that their sentences are disproportionate to the gravity of their crimes. All appellants also claim that Judge Owen, in imposing identical one hundred year sentences upon all defendants except Indelicato, engaged in impermissibly "uniform" or "mechanistic" sentencing.
 
 
 94
 As we stated recently in United States v. Gaggi, 811 F.2d 47 (2d Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 3214, 3233, 96 L.Ed.2d 701 (1987), "[t]he Supreme Court has warned that we should not substitute our judgment for that of the sentencing court, but when applying the Eighth Amendment to decide only whether the sentence is within constitutional limits; a review that rarely requires extended analysis." Id. at 63 (citing Solem v. Helm, 463 U.S. 277, 290 n. 16, 103 S.Ct. 3001, 3009 n. 16, 77 L.Ed.2d 637 (1983)).
 
 
 95
 As to Furnari and Scopo's contention that their culpability was not as great as their codefendants', Judge Owen noted that although Furnari and Scopo were not "bosses" or "underbosses," Furnari was "consigliere of the Lucchese Family which [is] ... practically the equivalent of the underboss," and that he had been involved in many of the recorded meetings where intimate knowledge of the Commission's violent business was evident. With respect to Scopo, Judge Owen noted his association with the Colombo family, his importance to the Commission bosses, and his inclusion in sensitive La Cosa Nostra discussions. The Judge also considered Scopo's own recorded words, which showed that for at least fifteen years Scopo had been involved in corrupting organized labor and extorting construction contractors.
 
 
 96
 Nor do we find the district court's sentencing to be improperly mechanistic or uniform. The court articulated its consideration of individual factors in the sentencing of each defendant. While we admit that the one-hundred year sentences have a certain symbolic quality, we cannot say that Judge Owen relied so heavily on abstract considerations of deterrence and so little on considerations of individual circumstances as to amount to an abuse of his wide discretion in sentencing. See United States v. Gaggi, 811 F.2d at 62-63.
 
 Conclusion
 
 97
 We reverse the conviction of Indelicato for violation of 18 U.S.C. Sec. 1962(c) as time-barred, and affirm on all other counts with respect to all appellants.
 
 
 98
 BRIGHT, Senior Circuit Judge, concurring in part and dissenting in part.
 
 
 99
 I agree with much of Judge Mahoney's excellent opinion in this case. Nevertheless, I dissent in part.
 
 I dissent on the following issues:
 
 100
 1. From my review of the evidence, I do not believe that the government presents sufficient evidence to support the convictions of Corallo and Santoro on the loansharking conspiracy (predicate act 17 and count 22; see majority op. at 532).
 
 
 101
 2. Indelicato suffered convictions for participation in a RICO conspiracy (count one) and the substantive RICO offense of participating in an enterprise through a pattern of racketeering (count two). The majority has set aside the substantive RICO violation (count two) as outside the statute of limitations (majority op. at 534). In my view, the RICO conspiracy conviction against Indelicato cannot stand because the evidence is insufficient to tie the Commission members to the alleged predicate acts of Indelicato--the Galante murders.
 
 
 102
 In discussing the sufficiency of the evidence, I believe it proper to observe that because the defendants may have been shown to belong to the La Cosa Nostra does not justify putting them in jail for one hundred years on evidence that does not establish guilt beyond a reasonable doubt.
 
 
 103
 While concurring on other legal issues, I express disagreement with the reasoning underlying these determinations. The panel is bound by the precedent of the in banc court's ruling in United States v. Indelicato, 865 F.2d 1370 (2d Cir.1989) that the simultaneous Galante killings may constitute a "pattern" of racketeering activity. While I am bound by that decision, I express disagreement with it. Further, the panel affirms the RICO conspiracy conviction of Indelicato as within the five-year statute of limitations for a RICO conspiracy on grounds that criminal conduct by Indelicato's coconspirators (the Commission), which continued beyond the 1979 Galante murders, serve to avoid the lapse of the statute of limitations. This holding derives from the analysis of United States v. Persico, 832 F.2d 705 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988). Again, while bound by that decision, I express disagreement with it.
 
 Discussion
 A. Evidentiary Issues on Which I Dissent
 1. The Loansharking Conspiracy
 
 104
 The jury convicted two of the defendants, Corallo and Santoro, of conspiracy to loanshark. That conviction should be cast aside. It is inadequate because, upon examination, the complete wiretaps fall short of establishing the agreement to participate in loansharking.
 
 
 105
 The majority's reliance on the recorded statements of Avellino (Corallo's driver) is misplaced. The majority quotes only the last sentence of Avellino's understanding of an agreement reached by the Gambino/Lucchese representatives as to DiLeo's activities on Staten Island.
 
 
 106
 What I meant, what he [Jimmy Brown, a Gambino representative at a Lucchese/Gambino meeting concerning the DiLeo matter] meant, to say, he doesn't want him to go out, uhh, bookmaking or shylocking or, or, uhh, running games or anything else like that. He says, uh, 'On....' You know, 'On his own, on his own ' he meant to say.
 
 
 107
 See majority op. at 532.
 
 
 108
 However, several days later Corallo met directly with DiLeo and the following conversation was recorded.
 
 
 109
 CORALLO: * * * You don't pay attention to that son-in-law of yours, you hear.
 
 
 110
 DiLEO: No, I'm not worried about him. You know what the trouble is, they're bullshitting that, you know, I'm with nobody, and nobody, you know.
 
 
 111
 CORALLO: They're right.
 
 
 112
 DiLEO: They're right.
 
 
 113
 CORALLO: They're right. You say they're right.
 
 
 114
 DiLEO: Right.
 
 
 115
 CORALLO: They're somebody, they're full of shit.DiLEO: Right, but what you suppose ...
 
 
 116
 CORALLO: Let them come and tell me.
 
 
 117
 DiLEO: Right. Weren't you supposed to settle this with him?
 
 
 118
 CORALLO: It's all settled, it's all settled.
 
 
 119
 DiLEO: There's no problem, I got no obligation to him.
 
 
 120
 CORALLO: You got no obligations to nobody. You listening?
 
 
 121
 DiLEO: Right. And if any ...
 
 
 122
 CORALLO: And if they come to you, they, they want a favor or something, you, you'll look into it.
 
 
 123
 DiLEO: Right.
 
 
 124
 CORALLO: And you check with us.
 
 
 125
 DiLEO: Right. But I gotta come back.
 
 
 126
 CORALLO: Don't forget.
 
 
 127
 DiLEO: But I come back to you. (Emphasis added.)
 
 
 128
 Defendants-Appellants Joint Appendix, Vol. 1-A-362.
 
 
 129
 Just what does all this virtually incomprehensible speech mean? Corallo's admonitions to DiLeo that he "is with nobody and nobody" and "[y]ou got no obligations to nobody" may indicate that DiLeo is on his own as to any activity he may engage in on Gambino turf. In this light, Avellino's ambiguous narration of Brown's remarks that "he doesn't want him [DiLeo] to go out * * * bookmaking * * * [o]n his own, on his own," implies that DiLeo is being told to work with the Gambino, not Lucchese family. Certainly, nowhere in the taped conversations do either Santoro or Corallo indicate an agreement to involve themselves in a loansharking operation on Staten Island.
 
 
 130
 The best that can be gleaned with certainty from the tapes is that Corallo and Santoro agreed to function, and did function, as referees between the Gambino and Lucchese families. It seems, however, a large step to say that these referee activities constitute a "conspiracy to loan shark." To the contrary, it appears that Corallo and Santoro's main object in negotiating DiLeo's difficulties was to prevent an internecine family battle, not to ensure continued loansharking activity. Not only is the evidence devoid of any suggestion that Corallo and Santoro were to receive a benefit from DiLeo's continued activities, it is not even clear that their aim was to facilitate illegality. See United States v. Peltz, 433 F.2d 48, 51 (2d Cir.1970), cert. denied, 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971) (finding a conspiracy where the purpose of the alleged illegal action is to impair the proper functioning of the government).
 
 
 131
 That the Commission's role as peace-keeper among the families should subject its officers to criminal liability for all crimes engaged in by any individual or family member of the Mafia would eviscerate the requirement of improper intent in our conspiracy laws. See United States v. Zambrano, 776 F.2d 1091, 1094 (2d Cir.1985) ("To be found part of a conspiracy, [defendant] must have 'in some sense promote[d] their venture himself, [made] it his own, [had] a stake in its outcome.' ") (citation omitted). While Corallo and Santoro had a stake in preventing a family feud, the evidence fails to reveal any interest, pecuniary or otherwise, they may have had in DiLeo's further actions in Staten Island, apart from avoiding further turf quarrels.[1] In my view, the garbled conversations do not, and cannot, add up to proof beyond a reasonable doubt of the existence of a loansharking conspiracy.
 
 
 132
 2. Whether the Galante Killings Can Be Tied to the Commission Enterprise.
 
 
 133
 I cannot agree that adequate proof exists of the connection between the Galante murders and the Commission enterprise. The government's proof rests, in my view, on an analogy to the movie, "The Godfather." However, a movie script does not constitute the kind of proof required to sentence men to prison for one hundred years.
 
 
 134
 Testimony that the "common law" of the La Cosa Nostra requires Commission authorization before a family boss can be killed does not prove that the "law" was observed in Galante's case. Similarly, testimony by Fred Christopher that Persico had "voted against" Galante's murder does not amount to proof that the rest of the Commission voted yes. The government's further assertion that Indelicato met at the Ravenite Social Club to be congratulated by other Commission members for a job well done rests on speculation and inference. No evidence sets out their conversation. The inference urged by the majority rests, in my view, upon an interesting but unproved scenario. Finally, the testimony of an undercover agent that the Bonanno family had been suffering from internal dissension, and that following Galante's death the Commission "reorganized" the family under another chieftain, adds nothing to the case when reorganization was inevitable upon Galante's death.
 
 B. Legal Issues on Which I Concur
 
 135
 I now discuss briefly my views on legal issues upon which I am obligated to concur because of precedential requirement, notwithstanding that I entertain doubts about the validity of those dispositions.
 
 
 136
 1. Indelicato's Participation in the Galante Murders Does Establish a Pattern of Racketeering to Support the RICO Conspiracy Conviction.
 
 
 137
 Based on an in banc determination, the majority holds that Indelicato's simultaneous murders constitute a pattern for the purposes of RICO. While the Second Circuit is not alone in holding that a pattern of racketeering activity can exist where several acts are committed in the course of one scheme, there is another view. The Supreme Court, in its seminal decision, Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), defined pattern as conduct where both "continuity plus relationship are present." In the Eighth Circuit, several related acts in the furtherance of one criminal goal do not fulfill this continuity requirement. Rather, "something more than a single scheme is required in order to establish a pattern of racketeering activity." Terre du Lac Ass'n, Inc. v. Terre du Lac, Inc., 834 F.2d 148, 149 (8th Cir.1987) (citing Superior Oil Co. v. Fulmer, 785 F.2d 252, 257 (8th Cir.1986)).
 
 
 138
 I believe the Eighth Circuit decisions properly mirror the statutory language. The three simultaneous Galante murders amounted to a single scheme, and thus would not constitute a pattern of racketeering activity under RICO. This construction is, I believe, more consonant with Congressional intent and accords greater respect to the plain language of the RICO statute.
 
 
 139
 2. Indelicato's Claim that his RICO Conspiracy Conviction is Barred by the Statute of Limitations.
 
 
 140
 Even if the murders constituted a pattern, the prosecution for conspiracy is time barred.
 
 
 141
 This court is bound by its prior decision in United States v. Persico, 832 F.2d 705 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988). The Persico court, confronted with the question of when the statute of limitations begins to run on a RICO conspiracy, analyzed the statute in a manner consistent with other conspiracy statutes not requiring proof of overt acts. The court thus held that the statute of limitations, as in a narcotics distribution conspiracy or Hobbs Act conspiracy, does not begin to run until the accomplishment or abandonment of the conspiratorial objectives. While bowing to the dictates of stare decisis, I nevertheless must express my disagreement with the reasoning in that opinion.
 
 
 142
 I am unconvinced that the principles governing the fixing of statutes of limitations in non-overt act conspiracies should be adopted and applied mechanically to RICO. It is true that where a conspiracy statute does not require the perpetration of an overt act, the limitations period does not begin to run until the conspiracy's objectives have been "accomplished or abandoned." United States v. Grammatikos, 633 F.2d 1013, 1023 (2d Cir.1980). But unlike other non-overt act conspiracies, RICO expressly requires that a defendant personally commit or agree to commit the predicate acts of racketeering in furtherance of the enterprise. Indeed, the Second Circuit has emphasized this requirement in United States v. Teitler, 802 F.2d 606 (2d Cir.1986), and United States v. Ruggiero, 726 F.2d 913 (2d Cir.), cert. denied, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984), thus distinguishing its treatment of a RICO conspiracy from other non-overt act conspiracies based on violations of antitrust or narcotics statutes.
 
 
 143
 I believe the requirement of personal action (or agreement to act) on the part of each defendant is a limiting principle which should be incorporated into all phases of RICO analysis. The doctrines of conspiratorial liability are broad. The RICO statute is loosely worded and contains almost limitless potential for expansive interpretation. A complete grafting of the former principle upon the latter statute presents, I believe, a frightening prospect.
 
 
 144
 Under Persico, prosecutors can bootstrap a conspiracy charge on a defendant's substantive act committed outside the five-year limitations period by linking it to acts committed by others within the statutory period. This linkage brings both offenses within the statute of limitations. Indelicato's case provides a disturbing paradigm. Even assuming that the 1979 murders were performed at the Commission's instance, it is unclear that Indelicato continued as an associate involved in Commission affairs. However, to convict, the jury needed only to determine that Indelicato did not affirmatively disassociate himself from the Commission conspiracy. Such determination brings the 1979 murders within the five-year limitations period by making Indelicato responsible for the many predicate acts committed by other Commission members. It is wrong to incorporate general conspiracy principles onto the RICO statute where such gross expansion of criminal liability results, without proof that the defendant engaged in any criminal activity.
 
 Conclusion
 
 145
 For the reasons stated above, I would set aside the convictions of Corallo and Santoro on loansharking and I would enter a judgment of acquittal of charges made against Indelicato.[2]
 
 
 
 [1]
 Although no express concession is made as to count 3, which charges a general conspiracy to extort in violation of 18 U.S.C. Sec. 1951(a) (1982), the concession as to the sufficiency of the evidence to sustain convictions for violation of counts 4, 6, 8, 12 and 14 appears applicable to count 3
 
 
 [2]
 This requirement results from 18 U.S.C. Sec. 1962(c), which renders criminal certain actions by "any person employed by or associated with any enterprise [here, the Commission] ... in the conduct of such enterprise's affairs...."
 
 
 [3]
 See supra note 2
 
 
 [4]
 Although the issue was not raised on the facts in Persico, it is clear that even when a RICO conspiracy continues into the limitations period, an individual conspirator can commence the running of the statute of limitations as to him by affirmatively withdrawing from the conspiracy. See In Re Corrugated Container Antitrust Litigation, 662 F.2d 875, 886 (D.C.Cir.1981)
 
 
 [5]
 In one of their numerous evidentiary challenges, appellants contest the admissibility of a recorded conversation of Avellino (Corallo's driver and a Lucchese family member) in which he discusses how, in cooperation with the Gambino family, to control a labor union. This conversation obviously furthered the Commission's purpose of coordinating joint ventures among the La Cosa Nostra Families. Moreover, although the union was not one of those involved in the "Club" scheme charged in this indictment, the evidence was properly admitted under Fed.R.Evid. 404(b) to show the background of interfamily relationships and the development of interfamily trust in the area of union control, the Commission's unique interfamily scheme for achieving such control, and the Commission's capacity to coordinate multifamily ventures in the area of union control. See, e.g., United States v. Brennan, 798 F.2d 581, 589-90 (2d Cir.1986) ("inclusionary" approach to Rule 404(b) followed in Second Circuit)
 
 
 [6]
 Of these seven circuits, the only one to depart from the rule that the definitive date is the date of the circuit court's issuance of the mandate set a later date, the district court's receipt of it. See United States v. Lasteed, 832 F.2d 1240, 1243 (11th Cir.1987)
 
 
 [7]
 At trial, the government took the position that it would only produce the grand jury minutes if and when Bruno was called as a witness. This does not violate Brady. See, e.g., United States v. Ruggiero, 472 F.2d 599, 604-05 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973)
 
 
 [8]
 The closest appellants came to raising the possibility of admission under 804(b)(1) was the unsupported prediction that, if Bruno were called as a witness, he would invoke his fifth amendment privilege against self incrimination. See United States v. Pelton, 578 F.2d 701, 709-10 (8th Cir.) (where no effort to produce grand jury witness in court, mere assertion that grand jury witness' attorney had advised declarant to invoke privilege too speculative to meet proponent's burden of establishing that declarant would invoke privilege), cert. denied, 439 U.S. 964, 99 S.Ct. 451, 58 L.Ed.2d 422 (1978). Appellants did not even request a court ruling that Bruno had a valid privilege. See United States v. Mangan, 575 F.2d 32, 45 n. 14 (2d Cir.) (unavailability under Rule 804 requires a court ruling that the desired testimony is privileged), cert. denied, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978)
 
 
 [9]
 18 U.S.C. Sec. 1963(a) (Supp. IV 1986) provides for a maximum prison sentence of twenty years for violation of 18 U.S.C. Sec. 1962(d) (1982)
 
 
 [10]
 18 U.S.C. Sec. 1963(a) (Supp. IV 1986) provides for a maximum prison sentence of twenty years for violation of 18 U.S.C. Sec. 1962(c) (1982)
 
 
 [11]
 18 U.S.C. Sec. 1951 (1982) provides for a maximum prison sentence of twenty years for violation of that section
 
 
 [12]
 18 U.S.C. Sec. 892(a) (1982) provides for a maximum prison sentence of twenty years for violation of that section
 
 
 [1]
 Corallo's comment to DiLeo that "[a]nd if they come to you, they, they want a favor or something, you, you'll look into it. * * * And you check with us," does not establish that whatever loansharking DiLeo is going to engage in in the future must be monitored and reported back to Corallo. Rather, it supports the notion that Corallo intends to involve himself in DiLeo's affairs only insofar as they create potential conflict with the Gambino family
 
 
 [2]
 This acquittal is not to say that Indelicato goes free because of technicalities. In fact, if he is a murderer, the state of New York should have prosecuted him, and I believe can still do so