**UNITED STATES of America, Appellee**

v.

**Allen R. HAWKINS, Appellant.**

Nos. 95–3185, 95–3186.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 25, 1996.

Decided Jan. 14, 1997.

Rehearing Denied March 19, 1997.

Ralph Drury Martin, appointed by the court, argued the cause and filed the briefs for appellant Allen R. Hawkins.

Kenneth D. Auerbach, appointed by the court, argued the cause for appellant Dwight L. Thomas. Elaine R. Lubin, appointed by the court, was on the brief.

Anjali Chaturvedi, Assistant U.S. Attorney, argued the cause for appellee, with whom Eric H. Holder, Jr., U.S. Attorney, John R. Fisher and Elizabeth Trosman, Assistant U.S. Attorneys, were on the brief.

Before GINSBURG, HENDERSON, and ROGERS, Circuit Judges.

GINSBURG, Circuit Judge:

Allen R. Hawkins was convicted of conspiring to distribute and to possess with the intent to distribute heroin, in violation of 21 U.S.C. § 846; unlawful possession with intent to distribute and unlawful distribution of heroin, in violation of 21 U.S.C. § 841; and possession with intent to distribute and unlawful distribution of heroin within 1,000 feet of a school, in violation of 21 U.S.C. § 860, otherwise known as the Drug Free School–Zones Act or the "schoolyard statute." Hawkins challenges the two schoolyard convictions on the grounds, first, that the Congress does not have the authority under the Commerce Clause of the Constitution of the United States to prohibit heroin sales that do not affect interstate commerce and, second, that the Government failed to prove that the school building near which he had been distributing heroin was in fact a school. Dwight L. Thomas was also convicted of conspiring to distribute heroin and of possession with intent to distribute heroin within 1,000 feet of a school. Thomas joins Hawkins' challenges to the schoolyard statute and additionally contends that there was insufficient evidence to support his convictions. None of these challenges has any merit.

## I. BACKGROUND

Officer Ralph Nitz testified at trial that, from a police observation post, he watched Hawkins and one Lionel Green sitting together on the front steps of the apartment building at 9010 Ninth Street in Northwest Washington, D.C. on the evening of January 3, 1995. A woman approached and handed Green some money, which he put into his coat pocket. Green then removed an object from under a patch of carpeting on the steps of the apartment building and from it withdrew a smaller object, which he handed to the woman. After the woman left the area, Green returned the object to its hiding place.

Several minutes later Officer Nitz saw a man approach Hawkins and Green. Hawkins retrieved a folded piece of paper from under the carpeting, opened the paper, and removed a light colored object. He handed the object to Green, who then handed it to the man, who gave Green some money and departed. The police stopped and searched the man and discovered that the object he had received from Green contained heroin.

Next, a car stopped in front of the apartment building. A passenger got out and Green got into the passenger seat. At this point, the police converged and detained Hawkins, Green, and the driver of the car, appellant Thomas.

In the ensuing search of the car, the police recovered several ziplock bags of heroin from behind the driver's side visor and from behind a notepad secured to the dashboard. From under the carpeting on the steps of the apartment building the police recovered eight additional ziplock bags of heroin.

Officer Nitz returned to the area on January 30, 1995 in order to measure the distance from the front steps of the apartment building to the Garnett Patterson Junior High School. At trial, he testified that he had found this distance to be 397.8 feet.

## II. ANALYSIS

Hawkins and Thomas both argue, based upon *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), that the Drug Free School–Zones Act exceeds the power of the Congress under the commerce clause. Hawkins maintains in the alternative that his conviction should be overturned because the Government failed to establish that his conduct occurred within 1,000 feet of an operating school. For his part, Thomas challenges his convictions on the ground that there was insufficient evidence to establish that he possessed the drugs that were found in his car and to link him to the underlying conspiracy to sell those drugs.

### A. The Constitutionality of the Schoolyard Statute

■ The appellants argue that The Drug Free School–Zones Act is unconstitutional because the sale of a controlled substance within 1,000 feet of a school does not substantially affect interstate commerce. The schoolyard statute, they say, is nothing more than an attempt by the Congress to exercise the police power reserved in the Constitution to the several States.

In *Lopez,* the Supreme Court delineated the three broad categories of activity that the Congress is authorized by the commerce clause to regulate:

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

—— U.S. at ——, 115 S.Ct. at 1629 (citations omitted). The Court readily concluded that possession of a gun within 1,000 feet of a school, which the Congress had sought to prohibit in the Gun Free School–Zones Act, 21 U.S.C. § 922(q), falls into neither the first nor the second category. *Id.* at ——, 115 S.Ct. at 1630. The Court then turned to the closer question whether such possession substantially affects interstate commerce.

The Court noted that "section 922(q) is a criminal statute that by its terms has nothing to do with commerce or any sort of economic enterprise, however broadly one might define those terms." —— U.S. at ——–——, 115 S.Ct. at 1630–31. Nor was § 922(q) "an essential part of a larger regulation of economic activity." *Id.* at ——, 115 S.Ct. at 1631. It could not therefore "be sustained under [the Court's line of] cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id.* Therefore, the commerce clause did not confer upon the Congress the power to enact the Gun Free School–Zones Act.

The appellants try to bring the Drug Free School–Zones Act within the scope of the Court's holding in *Lopez* by arguing that, although § 860(a) is concededly part of a larger scheme regulating the interstate commerce in drugs, it is not an essential part of that scheme. Zoning the traffic in controlled substances at the local level is not, the appellants maintain, an essential element of the larger scheme to control the interstate traffic in drugs.

The appellants err in thinking that *Lopez* controls this case. The Gun Free School–Zones Act punished simple possession of a firearm within 1,000 feet of a school; it did not purport to regulate commerce or anything incident thereto. The Drug Free School–Zones Act, in contrast, regulates distribution of, and possession with intent to distribute, illicit drugs within 1,000 feet of a school; it is not, therefore, "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise." Indeed, the schoolyard statute is directed specifically at a particular type of commercial activity.

Thomas argues that the prohibited activity is not commercial, at least insofar as the Act punishes possession with intent to distribute rather than actual distribution. This is like saying that warehousing goods prior to their final sale is not a part of interstate com-

merce—yet it, too, is a form of possession with intent to distribute. While mere possession, that is without intent to distribute, may be non-commercial and its prohibition in a federal statute would arguably implicate the rationale of *Lopez,* the fact remains that in the schoolyard statute the Congress punished possession only when it is incident to a commercial activity.

■ The appellants conclude by pointing out that the Congress made no findings in the course of passing the Drug Free School–Zones Act. The appellants err, however, in suggesting that this matters. Congressional findings are not a prerequisite to the exercise of an Article I power. See *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631, quoting *Katzenbach v. McClung,* 379 U.S. 294, 304, 85 S.Ct. 377, 383–84, 13 L.Ed.2d 290 (1964). We look to congressional findings only for aid in assessing the validity of the Congress's claim of authority.

As it happens, moreover, the Congress has made extensive findings regarding the relationship between local drugs sales and interstate drug traffic. The Congress concluded that the majority of the drugs that are distributed locally have traveled or will travel in interstate commerce. 21 U.S.C. § 801(3). "Local distribution and possession of controlled substances," even when those substances have not traveled in interstate commerce, "contribute to swelling the interstate traffic in such substances." *Id.* at § 801(4). Finally, because it is difficult to differentiate between controlled substances that have traveled in interstate commerce and those that have not, see *id.* at § 801(5), federal control over local distribution is essential to effective federal control over the interstate commerce in controlled substances. *Id.* at § 801(6).

These findings illuminate the close relationship between the local distribution of controlled substances and the interstate commerce in those substances. This provides ample support for the Congress's claim of authority to regulate that local distribution. *See, for example, Minor v. United States,* 396 U.S. 87, 98 n. 13, 90 S.Ct. 284, 289 n. 13, 24 L.Ed.2d 283 (1969); *Reina v. United States,* 364 U.S. 507, 512, 81 S.Ct. 260, 263–

64, 5 L.Ed.2d 249 (1960); *United States v. Owens,* 996 F.2d 59, 61 (5th Cir.1993); *United States v. Davis,* 561 F.2d 1014, 1019–1020 (D.C.Cir.1977).

Because we accept that the Congress has the authority to regulate all of the commerce in controlled substances, there is no need to consider—much less any need for particularized findings to aid in considering—whether the Congress has the authority to regulate a portion of that commerce. The legislature has the discretion, absent some competing constitutional constraint, to decide when, how, and how much of an activity that affects interstate commerce to regulate. *See, for example, Gibbons v. Ogden,* 22 U.S. (9 Wheat) 1, 197, 6 L.Ed. 23 (1824).

**B. Sufficiency of the Evidence Against Hawkins**

■ Hawkins contends that in order to prove a violation of the schoolyard statute the Government must show that he possessed or distributed heroin within 1,000 feet of an actual school, not just a school building that is no longer (or not yet) in use as a school. We agree. The Act applies not only to schools but also to "swimming pools," "playgrounds," "youth centers," and "video arcade facilities." While neither school nor swimming pool is defined in the Act, the other three terms are defined in a way that clearly implies that the whole statute is directed only to facilities where one would expect young people to congregate. See 21 U.S.C. § 860(e)(1) (defining playground as "any outdoor facility ... intended for recreation ... containing three or more separate apparatus intended for the recreation of children including, but not limited to, sliding boards, swingsets, and teeterboards"); *id.* at § 860(e)(2) (defining "youth center" to include facilities "primarily for use by persons under 18 years of age"); *id.* at § 860(e)(3) (defining "video arcade facility" to include "any facility, legally accessible to persons under 18 years of age"). The Congress is understandably concerned with drug dealing where it might attract children, not with its effect upon abandoned or unfinished school buildings. Reading the statute as a whole, therefore, we conclude that the Congress intended to subject drug dealers to enhanced

punishment only for conduct occurring within 1,000 feet of an operating school (or other listed facility).

■ This court cannot, however, agree with Hawkins' assertion that, viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential element of this crime beyond a reasonable doubt. Officer Nitz testified that Hawkins' drug offenses occurred within 1,000 feet of the "Garnett–Patterson Junior High School." He clarified his statement by adding "a middle school." As here used and qualified, a reasonable juror could take the word "school" to refer to an operating school. We therefore reject Hawkins' challenge to the sufficiency of the evidence against him.

C. Sufficiency of the Evidence Against Thomas

■ Thomas argues that there was insufficient evidence that he was involved in the conspiracy and that he possessed the heroin that was found in his car. Thomas claims that he simply came on the scene in order to speak with his brother-in-law, appellant Hawkins; he stayed in the car in order to keep warm, not for any illicit purpose. Furthermore, he says, there was no evidence that he, rather than his passenger, possessed the drugs that were in the car. Indeed, Thomas seems to think it helpful to his case that the drugs were concealed behind a notepad and a visor rather than in plain view ("the drugs could just as readily have been under the control of the front seat passenger who exited the car to make way for Green"), even though the visor was on the driver's side of the car.

Thomas relies upon several cases in which a defendant's mere presence on the scene has been held insufficient to establish his possession of an item found there. *See, e.g., United States v. Johnson,* 952 F.2d 1407, 1411–12 (D.C.Cir.1992). He also contends that expert testimony to the effect that drug dealers are typically resupplied at intervals during the night should not have been permitted to fill this putative evidentiary gap.

First, we do not agree that the testimony of the Government's expert witness filled an evidentiary gap; rather, the expert supported the Government's explanation of the defendants' behavior following Thomas's arrival on the scene, *viz.,* that Thomas was resupplying Green and Hawkins with drugs.

Second, we note that the cases from which Thomas has sought support for his argument all involved situations in which the defendant had at best tenuous control over the premises where the contraband was found. In *Johnson,* for example, we reversed the conviction of a defendant who was found in an apartment not his own, in which drugs and a gun were also discovered. The testimony of an expert witness to the effect that a drug dealer would never let an outsider get near his stash was insufficient by itself to establish the defendant's possession of the drugs discovered in the apartment. *Johnson,* 952 F.2d at 1411–12.

In the case now before us, in contrast, there was ample evidence suggesting that Thomas "knew of, and was in a position to exercise dominion and control over, the contraband." *United States v. Byfield,* 928 F.2d 1163, 1166 (D.C.Cir.1991). Thomas was driving the car in which the drugs were found. The drugs were within arm's reach—indeed, behind the visor on his side of the car. Although it is conceivable that someone else might have possessed the drugs, the jury could reasonably conclude, as it did, that the drugs were in Thomas's possession.

Finally, the evidence supports Thomas's role in the on-going conspiracy to distribute the drugs. In addition to possessing the drugs, Thomas drove the car and its illicit contents to the scene of the drug trafficking. Hawkins and Green immediately approached Thomas's car. Although Thomas had a familial relationship with Hawkins and claims that he came to talk with Hawkins, it was Green who got into the car with Thomas. Moreover, chemical analysis revealed that the drugs found in Thomas's car bore a striking similarity in quality to the drugs found in the stash at the scene of the transactions.

In sum, there was adequate evidence from which a reasonable juror could conclude that

Thomas was part of the on-going conspiracy to distribute drugs in front of 9010 Ninth Street, N.W. We therefore affirm Thomas's conviction in all respects.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is in all respects

Affirmed.