PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

DONNIE MONTGOMERY,
*Defendant-Appellant.*

No. 98-4688

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

DUANE CARROLL,
*Defendant-Appellant.*

No. 98-4689

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JAMES DEBERRY, a/k/a Peanut,
*Defendant-Appellant.*

No. 98-4690

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

KEVIN JONES,
*Defendant-Appellant.*

No. 98-4691

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.                                    No. 98-4692

PIRRIE COATES,
          *Defendant-Appellant.*


UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.                                    No. 98-4693

DANIEL HILL,
          *Defendant-Appellant.*


UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.                                    No. 98-4816

DWAYNE ALONZO HOLLAND, a/k/a
Diddles,
          *Defendant-Appellant.*


Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CR-96-399)

Argued: October 30, 2000

Decided: July 17, 2001

Before WIDENER, WILLIAMS, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Widener and Judge Williams joined.

## COUNSEL

**ARGUED:** Cyril Vincent Smith, ZUCKERMAN, SPAEDER, GOLDSTEIN, TAYLOR & BETTER, L.L.P., Baltimore, Maryland; Donald Henry Feige, Baltimore, Maryland, for Appellants. Martin Joseph Clarke, Assistant United States Attorney, Christine Manuelian, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Frederick J. Sullivan, Baltimore, Maryland, for Appellant Montgomery; Thanos Kanellakos, Baltimore, Maryland, for Appellant Jones; Jane C. Norman, BOND, CONTE & NORMAN, P.C., for Appellant Carroll; G. Godwin Oyewole, Washington, D.C., for Appellant Coates; Harold I. Glaser, Baltimore, Maryland, for Appellant Hill. Deborah S. Richardson, ZUCKERMAN, SPAEDER, GOLDSTEIN, TAYLOR & BETTER, L.L.P., Baltimore, Maryland; Charles G. Bernstein, BERNSTEIN & SAKELLARIS, Baltimore, Maryland, for Appellant Holland. Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellee.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

This case grows out of a federal task force's investigation of drug trafficking in a public housing project in Baltimore, Maryland. That project, the Westport Housing Project, contained an area known as Maisbury Court that operated as an open air drug market. The government alleged that from May 1992 until March 1997 Dwayne Holland and his organization, which included Donnie Montgomery, Daniel Hill, Pirrie Coates, Kevin Jones, James DeBerry, and Duane Carroll, joined in an extensive conspiracy to distribute heroin and crack cocaine, and committed various violent acts to further this conspiracy. After seven weeks of trial, a jury convicted all of these defendants of engaging in the five-year conspiracy and convicted some of them of other, related offenses. The defendants maintain that the investigation

of their crimes, and the resulting indictments, trial, and sentences are awash in legal error. The district judge issued two comprehensive published opinions in which he carefully considered, and rejected, most of these contentions. *See United States v. Holland*, 59 F. Supp. 2d 492 (D. Md. 1998); *United States v. Holland*, 985 F. Supp. 587 (D. Md. 1997). Nonetheless, these arguments are reiterated at length on appeal — in multiple briefs totaling more than 150 pages. For the reasons stated within, we reject these arguments. Accordingly, we affirm all of the convictions and sentences. Although we have carefully considered all of the arguments raised on appeal, we discuss only the most significant.

I.

We first address the district court's asserted pretrial errors.

A.

Hill maintains that the district court erred in refusing to dismiss his indictment on double jeopardy or due process grounds.

This argument grows out of a federal grand jury's indictment of Hill in 1994 on two counts: (1) conspiracy to distribute crack between July 1994 and October 19, 1994, and (2) possession with intent to distribute crack on October 17, 1994, arising out of a seizure of 78 grams of crack from a storage locker rented by Hill. Plea negotiations led the federal prosecutor to contact state officials to determine whether they were interested in prosecuting Hill on these charges in state court. Ultimately, Hill, defense counsel, and the state and federal prosecutors agreed that Hill would plead guilty in state court to distribution of cocaine and a one-day — October 17, 1994 — conspiracy to distribute cocaine. On February 2, 1995, Hill entered his plea to the state charges and fifteen days later the federal charges were dismissed.

Hill initially contends that the present conspiracy charge constitutes a reprosecution of the 1994 charges that were dismissed by the federal court in exchange for his guilty plea to identical charges in state court. We disagree. Neither the 1994 federal charges nor Hill's state plea constitute proper grounds for a double jeopardy claim. As to the 1994

federal charges, the district court noted, "no jury or witness was ever sworn in a trial of the 1994 federal charges" nor did Hill enter a "guilty plea in federal court" to those charges. *Holland*, 985 F. Supp. at 593. Accordingly, jeopardy never attached with respect to the 1994 federal charges.

With regard to the state plea, even though one overt act in Hill's present conspiracy charge involves crack found on October 17, 1994, in his storage locker, and so is based in part on the same conduct to which Hill pled guilty in state court in 1995, the doctrine of dual sovereignty permits the present prosecution. *See Heath v. Alabama*, 474 U.S. 82, 88-89 (1985). We also note that Hill has not demonstrated any factual basis for the "sham prosecution" exception to the dual sovereignty rule. *See Bartkus v. Illinois*, 359 U.S. 121, 122-24 (1959). Rather than being "dominated, controlled, or manipulated" by federal prosecutors, the district court found that the "state prosecutor was independent from the federal prosecutor, did not purport to represent the federal sovereign, was not funded by the federal sovereign and vindicated the separate interests of the state sovereign in prosecuting Hill." *Holland*, 985 F. Supp. at 594. Hill does not even suggest that these findings constituted clear error.

Although in the district court Hill specifically disavowed any claim that the government violated its 1994 agreement with him, *id.* at 593 n.3, Hill now maintains that in pursuing the present prosecution the government did violate this agreement and so his due process rights. Assuming that Hill has somehow preserved this claim for appellate review, it is nevertheless meritless. Hill contends that the "Federal Prosecutor dismissed the Federal indictment and *agreed to no further prosecution*" (emphasis added); he cites three record references assertedly supporting this charge. None of them do. Rather, the record reveals that the government agreed only to dismiss the federal charges "in return for a plea of guilty" on the state charges. *See* J.A. 2469. The federal prosecutor made *no* representations as to future prosecutions. The government certainly did not bind itself to forego the use of conduct giving rise to the 1995 plea as evidence of the much larger drug conspiracy charged here involving multiple participants over a five year period.[1]

---

[1]Hill also contends that the government violated his Fourth Amendment rights in conducting an "electronic surveillance [that] did not meet

## B.

Coates maintains that the district court lacked jurisdiction over his case at the time his trial commenced on January 22, 1998.

Prior to trial, Coates, like Hill, moved to dismiss the indictment on double jeopardy grounds. When the district court denied this motion, Coates, again like Hill, took an interlocutory appeal to this court pursuant to *Abney v. United States*, 431 U.S. 651 (1977). The government moved the district court to retain jurisdiction over both cases and proceed to trial during the interlocutory appeals, arguing that they were frivolous. The district court granted that motion as to Hill, but refused to find Coates's appeal frivolous and so denied the government's motion to retain jurisdiction over Coates's case. On January 6, 1998, however, we *sua sponte* issued an opinion and order dismissing both Hill's and Coates's interlocutory appeals as frivolous. *See* J.A. 245 ("we dismiss Coates's double jeopardy claim as frivolous."). Coates did not file a timely petition for rehearing or rehearing en banc; nor did he move to stay our mandate or seek certiorari in the Supreme Court.

On the day trial was to begin, January 21, 1998, a week prior to the January 28, 1988 issuance of our mandate, Coates moved to sever his case arguing that absent our mandate, the district court lacked jurisdiction. The district court denied the motion and proceeded to try Coates and his co-conspirators on January 22, 1998, on the erroneous theory that our order and opinion constituted a mandate.

Before us, Coates does not pursue his original double jeopardy claim but insists that the district court's failure to await our mandate left the district court devoid of jurisdiction over him. Ordinarily, an appeal "confers jurisdiction on the court of appeals and divests the

---

the standards of Title III," and used evidence derived from defective search warrants. Both arguments are meritless. The government used no Title III electronic surveillance techniques in this case, *see* 18 U.S.C. § 2511 (1994), and the search warrant claim cannot be reviewed because Hill has failed on appeal, as he did in the district court, *see Holland*, 985 F. Supp. at 599 n.14, to specify what warrant he contests.

district court of its control over those aspects of the case involved in the appeal. A district court does not regain jurisdiction until the issuance of the mandate by the clerk of the court of appeals." *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996) (citations and internal quotation marks omitted); *see also Alphin v. Henson*, 552 F.2d 1033, 1035 (4th Cir. 1977).

But this "divesture of jurisdiction rule is not based upon statutory provisions or the rules of civil or criminal procedure. Instead, it is a judge made rule originally devised in the context of civil appeals to avoid confusion or waste of time resulting from having the same issues before two courts at the same time." *United States v. Salerno*, 868 F.2d 524, 540 (2d Cir. 1989). Accordingly, as the government points out, appellate courts, including this one, have developed a "dual jurisdiction" rule, which allows a district court to proceed with trial while a defendant pursues an *Abney* double jeopardy appeal, where the district court has concluded that the appeal is frivolous. *See United States v. Head*, 697 F.2d 1200, 1204 & nn.3-5 (4th Cir. 1982). *Accord United States v. LaMere*, 951 F.2d 1106, 1108 (9th Cir. 1991); *United States v. Black*, 759 F.2d 71, 73 (D.C. Cir. 1985); *United States v. Hines*, 689 F.2d 934, 936-37 (10th Cir. 1982); *United States v. Bizzard*, 674 F.2d 1382, 1385 (11th Cir. 1982); *United States v. Grabinski*, 674 F.2d 677, 679 (8th Cir. 1982) (en banc); *United States v. Lanci*, 669 F.2d 391, 394 (6th Cir. 1982); *United States v. Leppo*, 634 F.2d 101, 105 (3d Cir. 1980); *United States v. Dunbar*, 611 F.2d 985, 987-88 (5th Cir. 1980) (en banc).

This case differs from most cases in which courts have adopted the dual jurisdiction rule because here the district court did not initially find the appeal frivolous. Rather, it expressly declined to make this finding. J.A. 235. Nonetheless, we believe that our *sua sponte* holding that the appeal was frivolous, combined with Coates's utter failure to seek timely reversal or stay of that holding, provided a sufficient basis for invocation of the dual jurisdiction rule.

After all, the courts of appeals formulated the dual jurisdiction rule in direct response to the Supreme Court's recognition in *Abney* that the delay attendant to interlocutory double jeopardy appeals could "be obviated by rules or policies giving such appeals expedited treatment" and the *Abney* Court's observation that "[i]t is well within the supervi-

sory powers of the courts of appeals to establish summary procedures and calendars to weed out frivolous claims of former jeopardy." 431 U.S. at 662 n.8. The *Abney* Court nowhere suggested that the district court, rather than the appellate court, had to make the finding as to the frivolousness of an interlocutory double jeopardy appeal in order for trial to begin during that appeal.

Moreover, the courts of appeals devised the procedure calling upon district courts to make the frivolousness finding prior to proceeding to trial not as a way to delay trial during frivolous *Abney* appeals, but as a means to facilitate trial during such appeals. If we adopted Coates's argument and held that the district court lacked jurisdiction to try him absent the district court's finding that his interlocutory appeal was frivolous, even though we had found the appeal frivolous and Coates had failed to seek reversal of that finding, we would sanction delay of trial during the pendency of a frivolous appeal. Thus to enforce the dual jurisdiction rule as Coates suggests would turn that rule on its head.

Furthermore, in the case factually closest to the one at hand, the Second Circuit has held as we do. *See Salerno*, 868 F.2d at 540. There, after the appellate court issued an order rejecting the *Abney* appeal, but before its mandate issued, the district court proceeded to trial. Even though the appellate court's mandate did not issue until the day before the lengthy trial ended, the Second Circuit ruled that the district court had jurisdiction to proceed without the mandate because the "likelihood" of "the meritless nature of the appeal" had "hardened into a certitude" with issuance of the appellate court's order. *Id.* Precisely the same rationale applies here.[2] Accordingly, we, like the

---

[2]*United States v. DeFries*, 129 F.3d 1293 (D.C. Cir. 1997), on which Coates relies, presents a very different situation from that at issue here or in *Salerno*. Indeed, the *DeFries* court recognized that *Salerno* had "no applicability to the case before [it]." *Id.* at 1303. While in *Salerno* (as here), the appellate court clearly "led the district court" to believe it had jurisdiction during an *Abney* appeal. *Id.* The *DeFries* court gave "no such message" during the government's interlocutory appeal of dismissal of a bank fraud count. *Id.* "To the contrary, when the government moved for expedited issuance of the mandate so that the district court could proceed to trial as scheduled, instead of immediately responding, [the appellate court in *DeFries*] directed the government to reply to appellants' pending rehearing motions. The fact that one judge voted to rehear the case *in banc* demonstrates that th[e] court was seriously considering the rehearing motions." *Id.*

*Salerno* court, hold that under the peculiar facts of this case, even absent issuance of our mandate, the district court had jurisdiction to proceed to trial.[3]

## II.

The defendants also raise numerous claims that reversible error infected their trial.

## A.

Only Montgomery and Carroll contend that the government failed to produce sufficient evidence to prove that they engaged in the charged five-year conspiracy. We examine the evidence in the light most favorable to the government and determine whether, so viewed, it "could support any rational determination of guilt beyond a reasonable doubt." *United States v. Powell*, 469 U.S. 57, 67 (1984).

Montgomery and Carroll maintain that the government presented far more evidence linking the other defendants to the conspiracy than it offered as to them and that the jury could have concluded from some of the government's evidence that they were not part of the conspiracy. Neither of these arguments compels reversal.

---

[3]Our holding finds additional support in the fact that some courts that have adopted the dual jurisdiction rule have held that the district court had jurisdiction to proceed to trial during an interlocutory appeal under unconventional circumstances. *See Lanci*, 669 F.2d at 394 (district court had jurisdiction after it merely determined that interlocutory appeal lacked a "colorable foundation"); *see also Bizzard*, 674 F.2d at 1385 (district court had jurisdiction even when defendant's second double jeopardy motion included grounds previously held nonfrivolous). Moreover, other courts have indicated that the failure of the district court to find the double jeopardy claim frivolous does not automatically divest that court of jurisdiction during a frivolous interlocutory appeal. *See Leppo*, 634 F.2d at 105 (when district court fails to make frivolousness finding, defendant may seek a stay or writ of mandamus or prohibition to delay trial during an interlocutory appeal to safeguard the *Abney* concerns); *Hines*, 689 F.2d at 934 (same).

As even Montgomery and Carroll themselves concede, the government did present some evidence that each was indeed part of the conspiracy. In fact, our examination of the record reveals that the government offered abundant evidence that Carroll worked as a lookout and a dealer for the Holland organization and that Montgomery acted in concert with Holland on more than one occasion to distribute drugs, including receiving 83 small packets of crack cocaine from Holland while Holland was fleeing police.[4] The evidence of Montgomery and Carroll's involvement in the conspiracy was thus sufficient.

## B.

Holland and Hill lodge several attacks involving Counts 5 and 8 of the indictment, which alleged distribution of crack cocaine "within one thousand feet of real property comprising a playground and the Westbrook Elementary School" in violation of 21 U.S.C. § 860 (1994).

---

[4]At trial, a police officer testified that upon entering a Maisbury Court house used by the Holland organization on February 8, 1996, to execute a search warrant, he saw Holland throw to Montgomery a bag ultimately found to contain 83 small packets of crack cocaine. The crack seized formed the basis for two substantive Counts — Counts 7 and 8 — charged against Holland and Montgomery, as well as evidence of the conspiracy. Montgomery joins Holland in claiming the police officer's loss of contemporaneous police photographs taken of the Maisbury Court house violated their due process rights. Because the photographs assertedly would have illustrated that the police officer's story was incredible given the physical layout of the Maisbury Court house, Holland and Montgomery maintain that Counts 7 and 8 of the indictment should have been dismissed.

Both before and after trial, the district court rejected this argument. *See Holland*, 985 F. Supp. at 594-96; *Holland*, 59 F. Supp. 2d at 517. The court's reasoning is impeccable. Moreover, because, as the district court found, there was no evidentiary basis for the allegation that the police officer acted in bad faith in losing the photographs, the district court did not abuse its discretion in refusing to give an instruction, requested by Montgomery, that would have permitted the jury to infer that the missing photographs would be adverse to the police officer's testimony. *See United States v. Jennell*, 749 F.2d 1302, 1308 (9th Cir. 1985).

First, they argue that the district court's instructions to the jury on these counts constructively amended the indictment, because although the indictment charged cocaine distribution "within one thousand feet of real property comprising a playground *and* the Westport Elementary School," the district court instructed the jury in the disjunctive, stating that "the government must prove" that the distribution "occurred within 1000 feet of the real property comprising an elementary school *or* a playground." (Emphasis added). Holland and Hill maintain that because of the indictment's conjunctive structure the jury was required to find them guilty of distribution within 1,000 feet of a "particular piece of real property comprising *both* a playground and the elementary school." (Emphasis added).

We find the argument unpersuasive. In *United States v. Rhynes*, 206 F.3d 349 (4th Cir. 1999), we held that "[w]here a statute is worded in the disjunctive, federal pleading requires the Government to charge in the conjunctive. The district court, however, can instruct the jury in the disjunctive." *Id.* at 384. To do otherwise would improperly add elements to the crime that are not contained in the statute itself. *See* 21 U.S.C. § 860 (criminalizing distribution of controlled substances within 1,000 feet of an elementary school or playground). Moreover, even if the district court had erred in instructing the jury in the disjunctive, the error would be harmless because the defendants stipulated that drugs were sold within one thousand feet of a playground *and* an elementary school.

Holland also argues that as an element of the offense, the government must prove that the Westport Elementary School, near which Holland distributed drugs in violation of § 860, was "operating" at the time of the drug distribution. Thus, Holland asserts that the district court improperly charged the jury on this offense when it failed to include the term "operating" in the instruction. As the government correctly points out, Holland does not challenge the evidence that he distributed drugs within 1,000 feet of Westport Elementary. Nor does Holland suggest that Westport was not functioning as a school. Moreover, the very case on which Holland relies, *United States v. Hawkins*, 104 F.3d 437, 440-441 (D.C. Cir. 1997), undermines his argument. In *Hawkins*, a police officer's testimony that defendant's drug offense occurred within 1,000 feet of a named junior high school (later clarified by adding "middle school") was held sufficient to support convic-

tion under § 860, because a reasonable juror could take the word "school" to mean operating school. *Id.* at 441.

The challenges involving Counts 5 and 8, therefore, fail.

### C.

DeBerry maintains that the district court erred in excluding certain housing administration documents, and in refusing to permit his former girlfriend, Tamika Randall, to testify. DeBerry sought to introduce this evidence to impeach the testimony of government witnesses that he had received drugs at the Maisbury Court house in late 1992.

The housing records consisted of a lease that DeBerry proffered would show that one of the girlfriends of a government witness did not rent the Maisbury Court house until March 1993, rather than in late 1992 as government witnesses had testified. The district court refused to admit the lease on the ground that it was "extrinsic impeachment on a collateral issue." J.A. 1769. The court did not err in so ruling. *See United States v. Kozinski*, 16 F.3d 795, 805-07 (7th Cir. 1994).

At the conclusion of the government's case, DeBerry sought to have Randall testify, proffering that she would testify about her relationship with DeBerry and their place of residence in 1992. Other defendants also sought to have various witnesses testify. The district court refused to permit Randall and several other defense witnesses to testify because those witnesses had attended the trial during the previous weeks in violation of the court's sequestration order. The district court explained that the sequestration order was

> [A] sensible reasonable requirement that all of counsel are fully aware of . . . . [I]f you have anybody who you want to put on the stand, then you cannot let them come to the trial. It couldn't be more simple than that.

J. A. 1731. The court recognized that in the proper circumstances it might permit testimony of a witnesses that breached the sequestration order and in fact had done that once during the trial. *See* J.A. 1730

("I realize I breached the rule for the government on that one occasion, but it's not a situation where it's a tit-for-tat situation. Each situation is considered on its merits.").

Defense counsel renewed the request that Randall be permitted to testify, arguing:

> Admittedly, Your Honor, she did appear in the courtroom periodically, but her testimony is in no way saying that — she's not going to be talking about Lambert or Corbin [government witnesses] or any of these other people. All she is going to be talking about is evidence that has not been introduced during the course of this trial, evidence basically about her relationship with him, where they lived, that he went to work, that kind of testimony. So, in other words, it is not the normal kind of testimony that is involved in a sequestration rule.
>
>     . . . .
>
>     . . . . I know the Court said, well, just because we let that agent testify, that doesn't mean we are opening the door or that we are going to change the rule. I thought it was more egregious to have allowed that agent to have testified than to allow Ms. Randall to testify.

J.A. 1740-41. The district court again denied the request explaining: "[t]here is no way for the Court to know — is she in the courtroom now?" When told that Randall was present, the court continued, "[Y]ou see, that is exactly my point. . . . We have no idea how much she has been in the courtroom." J.A. 1741. We have no difficulty concluding that a trial court would not abuse its discretion in refusing to permit a witness, who violated a sequestration order, to testify in these circumstances. *See United United States v. Cropp*, 127 F.3d 354, 363 (4th Cir. 1997); *United States v. Leggett*, 326 F.2d 613, 613-14 (4th Cir. 1964).

We detail the background for the exclusion of Randall's testimony because of an unusual problem that has surfaced on appeal — neither

we nor the parties have been able to find the sequestration order in the record. If the district court had never issued a sequestration order but nonetheless sought to impose violation of such an order as a basis for exclusion of defense witness near the conclusion of a seven-week trial, we would be deeply troubled. But during the trial, the court and the parties referred to the sequestration order and acted and argued in reliance of it. At no time during the lengthy trial did anyone — DeBerry's counsel, other defense counsel, or the prosecutors — ever suggest that the district court had not issued a sequestration order. DeBerry's entire argument was that the court should not exclude Randall's testimony *even though Randall had violated the sequestration order*. Similarly on appeal, although DeBerry does point out that he has been "unable to locate in the record or docket the entry of a sequestration order," he does not contend that such an order does not exist. In view of the repeated references to a controlling sequestration order at trial and DeBerry's counsel's acknowledgment of and attempt to explain non-compliance with that sequestration order, and the total failure of any party at trial — or even on appeal — to contend that the district court did not issue such an order, we can only conclude that the court did impose such an order, albeit perhaps orally in chambers. While this may not be the best practice, the district court's conduct does not constitute reversible error.

## D.

Holland maintains that the district court erred in refusing to sever his trial after one of his co-defendants, Kevin Jones, testified. We review this refusal to sever for abuse of discretion. *See Zafiro v. United States*, 506 U.S. 534, 538-9 (1993).[5]

---

[5]DeBerry and Montgomery complain that they were prejudiced by the alleged spillover effect of significant evidence admitted against their codefendants, and for this reason should have had their cases severed from the outset. Joinder is particularly favored in conspiracy cases. *See United States v. Tedder*, 801 F.2d 1437, 1450 (4th Cir. 1986). In refusing to grant the severance, the district court explained, "[a]lthough this is a death-eligible case, [only as to Holland, who was represented by two lawyers], the Attorney General has elected not to seek the death penalty. In this light, none of the defendants have demonstrated that unfairness will inhere in a joint trial." *Holland*, 985 F. Supp. at 602. Given the evidence in this case, the district court certainly did not abuse its discretion in so ruling.

In addition to the testimony of more than thirty witnesses, the government sought to prove its case with the tape recordings of the defendants discussing drugs. To counter the defendants' claim that the identification of defendants' voices on the tapes by cooperating government witness was unreliable, the government sought mid-trial to obtain voice exemplars of Holland, Jones, and Hill. Those defendants moved the district court to deny this relief and "largely because of the inexcusable belatedness of the motion," the district court denied it. *Holland*, 59 F. Supp. 2d at 519. However, after the government rested, Jones testified in his own defense. Jones admitted his participation in the tape recorded conversations and that those conversations involved drug discussions but claimed he was just a minor player; in his testimony Jones also identified Holland's voice in the taped drug conversations. Holland contends that this identification caused "enormous and unfair prejudice" to him, requiring a severance. Specifically, Holland maintains that Jones's testimony prevented Holland from exercising a "specific trial right," *Zafiro*, 506 U.S. at 539 — to rely on the district court's ruling prohibiting the government from obtaining voice exemplars from the defendants.

This argument must fail. First, it seems highly unlikely that Jones's testimony denied Holland the sort of "specific trial right" anticipated by the Supreme Court in *Zafiro*. While Holland concedes that Jones "had every right to testify" in his own defense and the government had the right to exploit that testimony, he maintains that Jones had no right "to defy the lower court's order after joining in Holland's motion." But Jones defied no order. The district court's order did not prohibit Jones from testifying, or identifying voices on the tape; it simply prohibited the government from obtaining his voice exemplar absent his consent. Jones's apparent change in trial strategy, not his violation of a court order, resulted in the identification of Holland's voice by a co-conspirator. Thus, it is unclear what "trial right" Jones's testimony denied. *Cf. Zafiro*, 506 U.S. at 539 (identifying possible trial rights that might have to be protected by a severance).

Furthermore, even if Jones's testimony did prevent Holland from exercising a "specific trial right," Holland must also demonstrate that denial of this right prejudiced him in order to obtain a severance. *Id.* The district court determined that it did not prejudice Holland because although Jones and Holland presented "divergent" defenses, these

defenses were "not mutually antagonistic." *Holland*, 59 F. Supp. 2d at 521. The court explained:

> Although Jones admitted to having a recorded conversation with Holland about drugs, his testimony did not establish that Holland was, in fact, the drug dealer that the government alleged. The jury could have believed that Jones was involved with drugs without also necessarily believing that Holland was the leader of the drug distribution organization in Westport as alleged in the indictment.

*Id.* Our review of the record reveals no abuse of discretion in this ruling.

### E.

Holland raises two appellate claims based on asserted violations of his Sixth Amendment rights as explicated in *Massiah v. United States*, 377 U.S. 201 (1964). There the Supreme Court held that the Sixth Amendment prohibits the government from deliberately eliciting incriminating evidence from an accused "after he ha[s] been indicted and in the absence of counsel." *Id.* at 206.

### 1.

Holland's principal claim arises from charges lodged against him in July 1993 in state court for the murder of Antonio Woodson. State authorities *nol prossed* those charges in November 1993. Holland maintains that the *nol prossed* 1993 charges render October 1994 taped statements of him to a federal informant inadmissible in the instant case in which he was charged *inter alia* with Woodson's murder. As the district court correctly noted, "[i]t was undisputed that Holland's right to counsel attached after he was charged with the murder of Woodson in July 1993 in state court, that the murder charge in the federal case addressed exactly the same conduct as the murder charge in state court, and that federal authorities knew of the failed state court prosecution of Holland for the murder at the time they were investigating him in the federal case." *Holland*, 59 F. Supp. 2d at 502.

Holland maintains that his invocation of his Sixth Amendment right to counsel when charged in state court in 1993 precluded federal authorities, or their agents, from obtaining information from him absent counsel a year after the state charges were *nol prossed*.

The Supreme Court has clearly instructed that the Sixth Amendment right to counsel "does not attach until a prosecution is commenced, that is, at or after initiation of adversary judicial criminal proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (internal quotation marks omitted). *See also Texas v. Cobb*, 121 S. Ct. 1335 (2001). Moreover, because it is "offense specific," this right "cannot be invoked once for all future prosecutions." *McNeil*, 501 U.S. at 175. Federal authorities did not initiate a criminal proceeding against Holland for the murder of Antonio Woodson until September 1997, almost three years after his October 1994 taped conversation with a federal informant. Thus, Holland's right to counsel in defending against this federal charge had not yet attached at the time of the October 1994 conversation.

Nevertheless, Holland maintains that the right to counsel that attached upon filing of the state murder charges survived *nol pros* of that charge and prevented federal agents from questioning him about the murder without counsel. Relying on the fact that under Maryland law a "nolle prosequi is *not* an acquittal or pardon of the underlying offense and does not preclude a prosecution for the same offense," *Ward v. State*, 427 A.2d 1008, 1013 (Md. 1981), Holland maintains that since he "still faced jeopardy" after the *nol prossed* state murder charge, his Sixth Amendment right to counsel has never "extinguish[ed]," and so the 1994 taped statements were inadmissible at his trial on the federal murder charge.

Adoption of this argument would provide a once-indicted defendant with a permanent constitutional shield. Neither the Sixth Amendment nor the Supreme Court's explication of the rights guaranteed by it countenance such a result. The purpose of the Sixth Amendment's guarantee of counsel is to "protec[t] the unaided layman at critical confrontations with his expert adversary, the government." *McNeil*, 501 U.S. at 178 (internal quotation marks omitted). When an indictment is dismissed (or *nol prossed*) and a defendant discharged, the

respective positions of the government and defendant undergo a most important change — they cease to be adversarial. Thus, after dismissal of the state murder charge, Holland no longer faced an "expert adversary." *Id.* As one of the cases on which Holland heavily relies notes, "[a]fter dismissal, there was nothing upon which [the defendant] could be convicted, nor were there charges under which the State could conduct a prosecution. . . . [T]he positions of the State and [the defendant] absolutely changed and they were no longer in legally adversarial positions." *State v. Frye*, 897 S.W.2d 324, 328 (Tex. Crim. App. 1995) (en banc). In sum, dismissal of the state murder charge meant Holland was no longer "facing a state apparatus that has been geared up to prosecute him." *Arizona v. Roberson*, 486 U.S. 675, 685 (1988).

We note that most courts to consider the question have refused to hold that "once a defendant has been charged," even after those charges are dismissed, the police and their agents are barred from questioning him "about the subject matter of those charges unless his counsel is present." *United States v. Mapp*, 170 F.3d 328, 334 (2d Cir. 1999)(internal quotations marks omitted); *see also United States v. Bartelho*, 129 F.3d 663, 674-75 (1st Cir. 1997); *United States v. Martinez*, 972 F.2d 1100, 1104-05 (9th Cir. 1992); *United States v. Skipworth*, 697 F.2d 281, 284 (10th Cir. 1983); *State v. Perry*, 515 S.E.2d 582, 592 (W. Va. 1999); *People v. Riggs*, 568 N.W.2d 101, 117 (Mich. App. 1997). The three assertedly contrary cases that Holland cites grow out of very different facts; moreover, they either rely on pre-*McNeil* case law, *see United States v. Valencia*, 541 F.2d 618, 622 (6th Cir. 1976), or involve the prosecution's dismissal of charges specifically to gather evidence to reindict, *see Frye*, 897 S.W.2d at 329-30, or both, *see United States v. Marshank*, 777 F. Supp. 1507, 1526 (N.D. Cal. 1991). We do not find them persuasive. Rather, we hold that the Sixth Amendment does not provide an accused, once charged, with "blanket prohibition on interrogations on the subject matter" of those charges, even after the charges have been dismissed. *Martinez*, 972 F.2d at 1105.

Some of the courts that have similarly so held have nonetheless recognized that "the Sixth Amendment would be violated if state and federal authorities colluded to manipulate the timing of the dismissal and the filing of charges in a manner calculated to deprive an individ-

ual of his right to counsel." *Mapp*, 170 F.3d at 334; *see also Martinez*, 972 F.2d at 1105-06; *Perry*, 515 S.E.2d at 592; *Riggs*, 568 N.W.2d at 116-17; *see generally Bartelho*, 129 F.3d at 675 ("Deliberate chicanery by the government intended to subvert an accused's Sixth Amendment rights, by delaying formal charges, may give rise to a right to counsel before charges are brought."). Holland argues in the alternative that the substantial "cooperation" between the state and federal authorities in this case "is sufficient to require suppression" of the October 1994 statements under this "collusion exception." We note that the Supreme Court's recent refusal to find any exception to the Sixth Amendment offense-specific rule for crimes "factually related" to the charged offense, *Cobb*, 121 S. Ct. at 1340, at the very least calls into question the viability of any "collusion exception" to the offense-specific rule. In any event, Holland has utterly failed to establish the deliberate misconduct necessary to sustain such a "collusion exception." Indeed, the district court specifically found that "there was no collusion between the federal and state authorities in an effort to circumvent Holland's Sixth Amendment right to counsel." *Holland*, 59 F. Supp. 2d at 504. The record evidence amply supports this finding.

2.

Holland's remaining *Massiah* claim involves a statement he made to law enforcement officers on October 24, 1996.

On February 8, 1996, following execution of a search warrant in which 83 small bags of crack cocaine were found in the Maisbury Court house, the Baltimore City police arrested Holland and Montgomery. *See supra* n.4. After his arrest, Holland retained counsel, who entered an appearance in state court. Holland and Montgomery were then charged in state court with a one-day conspiracy to possess with intent to distribute crack cocaine on February 8, 1996, and substantive charges arising from the search. The charges were *not* dismissed, but Holland and Montgomery were released on bail. On October 23, 1996, a federal grand jury indicted them on one count of possession with intent to distribute crack cocaine on February 8, 1996. After their arrest the next day, October 24, 1996, FBI agents and city police officers interrogated Holland and Montgomery, with-

out legal counsel, even though at least one of the interrogators knew Holland was represented by counsel.

Prior to trial in the instant case, Holland and Montgomery moved to suppress their October 24, 1996 statements. In response, the government stated that:

> After a review of the applicable law cited by both Defendants, the government finds that when both Defendants were questioned by state and federal agents on October 24, 1996, the Defendants' Sixth Amendment right to counsel had already attached as a result of their arraignment on the same charges in the state judicial system.

*Holland*, 59 F. Supp. 2d at 501 n.6. Accordingly, the government told the court that it would not oppose the suppression motion and that "an evidentiary hearing on this matter will not be necessary." *Id.* at 501-02 n.6. Thus, the district court never admitted Holland's October 24, 1996 statements into evidence at trial.

Holland contends that exclusion of his statement was not enough. He maintains that a good deal of other evidence was "fairly traceable" to the October 24, 1996 statement and the district court erred in admitting that evidence. The government does not contest the application of the exclusionary rule to the Sixth Amendment violations. It maintains, however, that the other evidence is "sufficiently distinguishable," *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963), from the October 24, 1996 statement, to be admissible. Specifically, the government argues, *inter alia*, that the challenged evidence was derived from a source independent from the October 24, 1996 statement, and thus was admissible under *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920).

The district court permitted Holland, Montgomery, and the government to voir dire relevant witnesses to determine the use made of the October 24, 1996 statements. After consideration of that testimony, the district court concluded that "much of the information" provided in the statements "was already known to law enforcement" from an "independent source" and so denied Holland's motion to suppress the other evidence. *Holland*, 59 F. Supp. 2d at 515. After trial, in its com-

prehensive published opinion, the district court detailed the precise independent source for each piece of critical information. *Id.* at 512-15. On appeal, Holland does not maintain that the independent source doctrine does not apply. His only argument is that the district court's findings constitute clear error. We have carefully examined the record and can find no fault in the district court's findings.

### III.

Finally, the defendants attack their sentences on various grounds. In reviewing the application of the sentencing guidelines by the district court, we apply the clear error standard for factual determinations and the *de novo* standard for legal questions. *See United States v. Blake*, 81 F.3d 498, 503 (4th Cir. 1996).[6]

### A.

DeBerry challenges several of the district court's factual findings regarding his base offense level. The jury convicted DeBerry only on the conspiracy count. The district court found that DeBerry participated in the conspiracy to distribute drugs as part of the Holland organization from February 1994 through February 1996. *Holland*, 59 F. Supp. 2d at 529. The court, thus, attributed to DeBerry the heroin and crack quantities distributed after February 27, 1994, as within the "scope of DeBerry's agreement and foreseeable to him." *Id.* These quantities established DeBerry's base offense level at 38.

DeBerry first maintains that the government produced insufficient evidence to prove that he began his participation in the conspiracy as early as February 27, 1994. Our review of the record reveals abundant

---

[6]In a one-sentence argument, Montgomery maintains that the district court erred in sentencing him as a career offender. The basis for this argument seems to be that he is outside the "heartland" of the career offender guidelines and thus a departure is warranted. *See United States v. Williams*, 78 F. Supp. 2d 189, 193-94 (S.D.N.Y. 1999). Even assuming that this question is reviewable, and that this argument has merit, Montgomery never made this assertion before the district court, *cf. id.*, and the district court did not commit plain error in failing to depart from the applicable career offender guideline *sua sponte*.

evidence from numerous witnesses — including Lambert, Jones, Corbin, and Gilliam — that DeBerry began his participation in the conspiracy by February 27, 1994. The district court did not err in so finding.

DeBerry also maintains that the district court erred in calculating the quantity of drugs attributable to him. He claims that the court could not rely on the "uncorroborated testimony" of various cooperating witnesses; that argument is meritless. *See, e.g.*, J.A. 503-04, 512, 756-59. The district court painstakingly reviewed the evidence to determine the appropriate drug quantity attributable to DeBerry and each of his co-conspirators. *See Holland*, 59 F. Supp. 2d at 524-530. We find no reversible error in these calculations.

B.

Holland and Jones contend that their sentences should not have been enhanced because of Woodson's murder.

The guidelines direct that in sentencing drug offenders, the court must enhance the sentence when a killing occurs in the course of a drug trafficking conspiracy "under circumstances that could constitute murder under 18 U.S.C. § 1111." U.S.S.G. § 2A1.1. The jury's acquittal of Holland on the count in the indictment charging Woodson's murder does not prevent the sentencing court from considering conduct underlying the charged crime so long as such conduct has been proved. *See United States v. Watts*, 519 U.S. 148, 152 (1997). Proof by a preponderance of evidence is sufficient as long as the enhancement is not "a tail which wags the dog of the substantive offense." *Id.* at 156 n.2 (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986) (suggesting clear and convincing standard should be applied when considering acquitted conduct that would substantially increase sentence)).

As he did before the trial court, Holland insists that (1) the clear and convincing standard applies, and (2) under any standard the government produced insufficient evidence that (a) he fired the shot that killed Woodson and (b) he killed Woodson because Woodson disrupted his drug distribution activity by robbing one of his confederates, Howard Horton. The district judge carefully considered and

rejected both arguments. In an abundance of caution, the court found that even if the clear and convincing standard applied, the government had produced sufficient evidence to establish that Holland fired the fatal shot, and did so in furtherance of the drug conspiracy. *Holland*, 59 F. Supp. 2d at 536-37. We have carefully reviewed the record — again there is no error at all in the district court's findings.[7]

Jones joins in Holland's evidentiary challenge, maintaining that he was at most "a spectator and not a participant" in the Woodson killing. Like Holland, Jones maintains that the witnesses relied on by the government were not credible and should not have been believed by the district court. Again, close review of the evidence reveals no error. As the district court found, Jones's role as an "enforcer," who inflicted beatings on those who interfered with the workings of the drug conspiracy, made the Woodson murder foreseeable to him and U.S.S.G. § 2A1.1 applicable. *Id.*

## C.

Holland also maintains that the "law of the case" requires that his base offense level be Level 34.

Prior to trial, the government stipulated as part of the plea agreement with one of Holland's conspirators, Melvin Corbin, that Corbin "knew or could have reasonably foreseen" that the equivalent of at least three but less than ten kilograms of heroin were involved in the charged conspiracy, yielding a base offense level of 34; the district court accepted the stipulation and sentenced Corbin based upon it. Holland contends that U.S.S.G. § 6B1.4, internal Justice Department policies, and Fed. R. Evid. 801(d)(2) bind the government in connection with his sentencing to the representations made in its stipulation with Corbin.

---

[7]The district court also found the preponderance of the evidence supported an enhancement of Holland's sentence for possession of a firearm in connection with a drug distribution conspiracy pursuant to § 2D1.1(b)(1). *See* 59 F. Supp. 2d at 537-39. Ample evidence supports that finding.

The district court rejected this argument, concluding, as the government had maintained, that trial testimony, establishing a conspiracy to distribute at least 30 kilograms of heroin and at least 1.5 kilograms of crack resulting in a base offense level of 38, should be used to sentence Holland and the other defendants. We see no error. On appeal, even Holland concedes that case law teaches that if the Corbin stipulation was the result of an "innocent mistake" it should not benefit other members of the conspiracy. *See, e.g.*, *United States v. Piche*, 981 F.2d 706, 719 (4th Cir. 1992).[8]

D.

Finally, some of the defendants argue that the terms of their sentences run afoul of *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

Although the second superseding indictment in this case charged the defendants with conspiring to distribute a sufficient quantity of drugs to warrant a maximum of life imprisonment under 21 U.S.C. § 841(b)(1)(A), the court did not submit the issue of drug quantity to the jury. Yet, at sentencing, the district court determined that Holland, Hill, Jones, and DeBerry distributed more than fifty grams of crack cocaine and sentenced each of them under § 841(b)(1)(A) to more than twenty years imprisonment. Specifically, the district court sentenced Holland, Hill, and Jones to life imprisonment and DeBerry to 360 months imprisonment.

While this case was on appeal, the Supreme Court decided *Apprendi*, in which it announced a new rule of constitutional law. In *Apprendi*, the Court upheld a challenge to a hate-crime statute that included a sentence enhancement that the trial judge could apply upon finding by a preponderance of the evidence that the defendant's crime was motivated by racial animosity. The Supreme Court struck down the provision as unconstitutional, holding that "[o]ther than the fact

---

[8]In his reply brief, Holland maintains that the mistake as to the proper base level was not innocent but the result of actual prosecutorial misconduct. Given Holland's failure to raise this argument in his principal brief, we decline to consider it. We do note that he raised a related prosecutorial misconduct argument in the district court, which was rejected and which he does not reassert here. *See Holland*, 59 F. Supp. 2d at 521-23.

of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Although *Apprendi* involved a trial judge's application of a hate-crime sentence enhancement, federal appellate courts have uniformly applied its rule to 21 U.S.C. § 841. *See United States v. Promise*, ___ F.3d ___, ___, No. 99-4737 (4th Cir. June 29, 2001), Slip Op. at ___ (collecting cases). Holland, Hill, Jones, and DeBerry contend that because their sentences exceed § 841(b)(1)(C)'s twenty-year maximum, *Apprendi* requires that we remand their cases for resentencing.[9]

Because they failed to raise their *Apprendi* argument before the district court, we review for plain error only. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731-32 (1993). "Rule 52(b) contains three elements that must be established before we possess the authority to notice an error not preserved by a timely objection: The asserted defect in the trial proceedings must, in fact, be error; the error must be plain; and, it must affect the substantial rights of the defendant." *United States v. Cedelle*, 89 F.3d 181, 184 (4th Cir. 1996) (citing *Olano*, 507 U.S. at 731-32). Even when all three elements are present, we may decline to notice an error if it does not "'seriously affect the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 736 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

---

[9]Montgomery also makes an *Apprendi* claim, but the district court did not in any way err in sentencing him. The jury convicted Montgomery not only of violating § 841 but also of violating 21 U.S.C. § 860 (1994) by distributing a controlled substance within 1,000 feet of a school and playground. The § 860 conviction subjected him to a sentence of "twice the maximum punishment authorized by Section 841(b)." *See* 21 U.S.C. § 860. In this case, that amount was 40 years (twice 20 years). *See, e.g.*, *United States v. Parker*, 30 F.3d 542, 551 (4th Cir. 1994). The district court sentenced Montgomery to a total of 262 months imprisonment (almost 22 years). Since this sentence does not exceed the statutory maximum under § 860, the district court did not err in sentencing Montgomery. We note that Holland and Hill were also convicted of violating § 860, but their life sentences exceed the statutory maximum permitted under § 860.

In *Promise*, this court, sitting en banc, recently held that drug quantity was to be treated as an element of an aggravated drug offense under § 841 and that the statutory maximum penalty for conspiring to distribute an unknown quantity of heroin or cocaine base is twenty years under § 841(b)(1)(C). Accordingly, sentencing a defendant to more than that statutory maximum without having submitted the element of drug quantity to the jury constitutes plain error. However, pursuant to our recent opinion in *United States v. Stewart*, ___ F.3d ___, ___, No. 98-4155 (4th Cir. July 6, 2001), if drug quantity was charged in the indictment, as it was here, then failure to submit drug quantity to the jury does not affect a defendant's substantial rights if the trial produced "uncontested and overwhelming evidence" of drug quantity sufficient to sustain the sentence.

Just as in *Stewart*, the district court in this case committed plain error under *Apprendi*. However, the evidence that Holland, Hill, Jones, and DeBerry conspired to traffic in more than 50 grams of crack cocaine and more than 1 kilogram of heroin is similarly uncontested and even more "overwhelming" than it was in *Stewart*.[10] For example, the trial court heard testimony from a former "lookout" that the drug operation sold more than 300 bags of crack cocaine per day, which the court found amounted to approximately 49 grams of crack cocaine sold *per day* in a conspiracy spanning several years. *Holland*, 59 F. Supp. 2d at 525 & n.35. In addition, there was testimony that the organization sold approximately 250 bags of heroin per day from the Fall of 1992 to the Fall of 1995. Thus, the district court found that the operation sold more than 30 kilograms of heroin during that time. *Id.* at 527. Another former "lookout" and dealer testified that he personally sold approximately 50-60 bags of heroin per day and at times witnessed each defendant "cut" large quantities of heroin in preparation for sale. Still another witness testified that she twice accompanied Holland to New York to purchase an estimated 30 to 50 grams of raw heroin each time. The government also introduced audiotape excerpts that captured Holland and Jones discussing trips to New York to purchase drugs. Several witnesses testified that they bought

---

[10]While the defendants certainly contested their involvement in the conspiracy, there was no suggestion that the drug quantities attributed to the conspiracy were less than the minimum amount required under § 841(b)(1)(A).

heroin from at least one of the defendants on several occasions. More-over, during two controlled buys, the government seized more than 6 grams of crack and another 3.5 grams of heroin. The government seized at least 30 grams of heroin in total.

The above sets out but some of the evidence the district court used in determining drug quantity. Because the evidence regarding drug quantity is essentially uncontested and overwhelming, following *Stewart*, the failure to submit drug quantity to the jury did not affect the defendants' substantial rights.

## IV.

Accordingly, for the reasons set forth within, we affirm the judgment of the district court in all respects.

*AFFIRMED*